FEDERAL DEPOSIT INSURANCE COR-
PORATION, in its Corporate Capacity
as Liquidator of Northwest Bank, Plain-
tiff,

v.

George DAY and Trinity-Western
Title Company, Defendants.

No. 4:85–CV–677–A.

United States District Court,
N.D. Texas,
Fort Worth Division.

Jan. 22, 1993.

Order Granting Additional
Attorney Fees Feb. 12, 1993.

John A. Gilliam, T. Ray Guy, Jenkens & Gilchrist, P.C., Dallas, TX, Thomas S. Rees, Trial Atty., Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, DC, for F.D.I.C.

John E. Collins, Law Offices of John E. Collins, Dallas, TX, for George A. Day.

David Broiles, Kirkley Schmidt & Cotten, LLP, Fort Worth, TX, Cathy Gribble Ries, Dallas, TX, for Trinity–Western Title Co.

MEMORANDUM OPINION and ORDER

McBRYDE, District Judge.

After having thoroughly reviewed and considered the various requests of Trinity–West-

ern Title Company (hereinafter "Trinity–Western") that sanctions be imposed on, and attorneys' fees assessed against, plaintiff, Federal Deposit Insurance Corporation, (hereinafter "FDIC"), and its counsel in this action, the responses of FDIC and its counsel to those requests, and all other matters pertinent to the subjects of the requests, the court has concluded that sanctions should be ordered and attorneys' fees awarded to the extent provided in this memorandum opinion and order.

## I.

### Nature of FDIC's Claims Against Trinity–Western

In July 1984 Northwest Bank (hereinafter "Bank") was a banking corporation chartered under the laws of the State of Texas. Northwest Financial Corporation (hereinafter "Financial") and NWB Corporation (hereinafter "Corp.") were Texas corporations. Larry H. Calhoun (hereinafter "Calhoun") owned 100% of the shares of Financial; and, Calhoun's wife was president, Calhoun was vice-president, and both of them were directors of Financial. Financial owned 100% of the shares of Bank; and, Calhoun was president and chairman of the board of directors of Bank. Bank owned 100% of the shares of Corp., and, Calhoun was president and chairman of the board of directors of Corp.

FDIC sought by amended pleadings in this action to recover from Trinity–Western damages allegedly suffered by Bank by reason of land transactions (hereinafter "disputed transactions") that occurred on July 24, 1984, affecting real property owned by Corp. The disputed transactions were the conveyance from Corp. to Financial and then from Financial to Calhoun of the real property on which Bank conducted its business.[1] FDIC

contended that Corp. did not receive enough for the property and that, by virtue of insolvency of the Bank and subsequent related events, it succeeded to whatever claims Bank had by reason of that fact.

The claims by FDIC against Trinity–Western were first asserted by FDIC in its First Amended Original Complaint (hereinafter "1st Amended Complaint"), which was filed July 24, 1987. FDIC complained (i) that the conduct of Trinity–Western, acting through its representatives, enabled Calhoun to obtain financing for the disputed transactions from Mutual Building & Loan Association (hereinafter "Mutual"), (ii) that the conduct constituted negligent misrepresentation, and (iii) that by reason of the conduct Trinity–Western was liable to FDIC for significant damages. There was no allegation by FDIC that Trinity–Western had any contractual or other relationship with Financial, Bank, or Corp.; and, the allegations were to the effect that Trinity–Western's relationship as to the disputed transactions was with Mutual and involved the performance for Mutual of functions normally carried out by a title insurance closing agent.

FDIC alleged that: Gayle Dickehut (hereinafter "Dickehut"), while serving as an escrow officer licensed to close transactions for Trinity–Western, prepared settlement statements that misstated the manner in which the proceeds of the loan to be made by Mutual were to be applied when she knew, or should have known, that one of the statements was false in respect to the manner in which the proceeds were to be distributed. She knew that the false statement was being presented to Mutual, and she knew and intended that Bank would be an indirect recipient[2] of the information contained on the statement. Thereafter, she prepared a second settlement statement and disbursed the

---

1. FDIC has complained against other parties about lease transactions that took place July 15, 1984, and July 24, 1984. Plaintiff's Original Complaint and Application for Temporary Restraining Order and Injunctive Relief at 5. However, FDIC has not included the lease transactions in any of its alleged causes of action against Trinity–Western. Plaintiff's First Amended Original Complaint at 19–20; Plaintiff's Second Amended Original Complaint at 14–16.

2. This "indirect recipient" language was not explained in any of FDIC's pleadings. There is no pleading or proof that Bank relied upon, or was misled, by any conduct of Dickehut or Trinity–Western. To the contrary, the facts are that the president and chairman of the board of Bank (Calhoun) gave Dickehut the information she used in preparing, and in revising, the settlement statement about which FDIC complains and that she prepared, and revised, the statement at his behest.

loan proceeds in accordance with its provisions but did not send a copy of the second statement to Mutual. Mutual has informed FDIC that it relied on the first statement in closing the loan and disbursing the loan proceeds, and would not have closed the loan had it seen the second statement, which showed that Calhoun was receiving a substantial part of the loan proceeds in cash. Dickehut was negligent and her negligence was imputed to Trinity–Western.

FDIC summed up by alleging that:

51. By reason of the negligence of Defendant Dickehut in preparing and disseminating the First Settlement Statement, and/or in failing thereafter to correct the information included therein when Defendant Dickehut knew such information to be false, the Bank and thereafter the FDIC have been damaged in an amount equal to the difference between the fair market value of the building in July of 1984 and the amount of consideration received by NWB Corporation therefor, for which the FDIC hereby sues Defendants Dickehut and Trinity–Western.

1st Amended Complaint at 20. The capacity in which FDIC asserted the claims against Trinity–Western was explained in FDIC's pleadings as follows:

11. Thereafter, the FDIC, as Receiver of the Bank, pursuant to an Order of the 48th Judicial District Court in and for Tarrant County, Texas in Cause No. 48–90043–85 ... conveyed to the FDIC, in its Corporate Capacity, certain assets formerly owned by the Bank. Among the assets thus conveyed to the FDIC, in its Corporate Capacity, were the claims, demands, actions, and causes of action made the subject of this Complaint.

12. Plaintiff FDIC accordingly became the party entitled to bring this action and to assert the claims and causes of action asserted herein against Defendants Calhoun, Northwest Financial, Mutual, Day, Dickehut, and Trinity–Western.

Id. at 3–4.

By its Second Amended Original Complaint (hereinafter "2nd Amended Complaint"), which was filed February 7, 1990, FDIC reasserted its negligent misrepresentation theory against Trinity–Western and added a theory of recovery based on alleged negligence of Dickehut growing out of the same events that formed the basis for the negligent misrepresentation theory. A condensed statement of the claim FDIC was making against Trinity–Western was contained in the Proposed Joint Pretrial Order filed April 26, 1991, in which FDIC said:

Plaintiff FDIC anticipates that Mutual's officers will testify that Mutual would not have provided the funding to Calhoun, enabling him to engage in the fraudulent and deceptive transaction, but for its receipt from Defendant Trinity Western of a false settlement statement prepared by Defendant Trinity Western, and delivered to Mutual and upon which Mutual relied in funding the loan. Furthermore, Trinity Western prepared a subsequent settlement statement that accurately reflected certain aspects of the transaction, which Trinity Western failed to deliver to Mutual. Preparation and delivery of the initial false settlement statement, and failure to deliver the more accurate second settlement statement to Mutual constitute negligence and negligent misrepresentation for which Trinity Western is liable for the foreseeable consequences....

Proposed Joint Pretrial Order at 2–3.

## II.

### History of the Litigation

After this action was instituted in September 1985, it pended six and one-half years before FDIC finally abandoned it in January 1992 by dismissing its appeal to the Fifth Circuit from an adverse trial court judgment that had been rendered on May 9, 1991. Three different district judges were involved. The record of the action suggests that probably hundreds, if not thousands, of hours were devoted to discovery and other pretrial matters. The direct cost of this litigation in the form of attorneys' fees and other litigation expenses, not to mention the burden on the judicial system and the cost in the form of time and overhead of the litigants that was consumed in the litigation, has been in the hundreds of thousands of dollars. All this was over claims FDIC never should have

asserted, and would not have asserted if it had been a responsible potential litigant and if its attorneys had honored their Rule 11 certification obligations.

Because the tremendous drain on judicial resources and on the resources of the litigants is of significance to sanction issues, the court is providing below a rather detailed chronological account of the litigation. Moreover, the history of the litigation is important because FDIC's handling, and disposition, of claims against other defendants provides insight into the objectives of FDIC and its counsel in the filing and pursuit of the claims against Trinity–Western.

The action was started by the filing on September 30, 1985, by FDIC of its original complaint and application for temporary restraining order and injunctive relief in which it named Calhoun, Financial, and Mutual as defendants. When FDIC filed the original complaint it already had knowledge of the ownership facts set forth in the first paragraph under the immediately preceding heading of this memorandum opinion and order and most of the other basic facts pertinent to this action. FDIC alleged that Calhoun and Financial had liability to it because of the disputed transactions and because of a lease arrangement Calhoun entered into with Bank in connection with the disputed transactions, and that the lien acquired by Mutual in the property was void, and should be declared to be such. FDIC sought, *inter alia*, an adjudication that it was the owner of the property in question, free of Mutual's lien, and sought a temporary restraining order and injunctive relief designed to prevent Mutual from foreclosing its lien on the property. When it was filed, the action was assigned to District Judge Eldon Mahon. The temporary restraining order was granted, but it was allowed to expire ten days thereafter when FDIC did not go forward with its application for preliminary injunction.[3]

Judge Mahon granted motions filed by FDIC and Mutual, respectively, for expedited discovery, and, within a short period of time after the action was filed, the court was faced with discovery motions and other preliminary motions. While the case was pending before Judge Mahon, ten notices of deposition were filed. The deposition notices indicate that depositions were taken of everyone who possibly could have knowledge of facts relevant to the claims FDIC later asserted against Trinity–Western. In October 1985, Mutual filed a motion for recovery of expenses pursuant to Fed.R.Civ.P. 11, to which FDIC responded. The motion was denied by order signed December 10, 1985.[4] By order signed January 2, 1986, Judge Mahon fixed a discovery deadline of October 20, 1986, a pretrial conference date of November 4, 1986, and a trial date of November 17, 1986, if jury, and of November 24, 1986, if non-jury.

On July 17, 1986, Mutual sought to bring the litigation to an end by the making of an offer of judgment pursuant to the authority of Fed.R.Civ.P. 68, tendering to FDIC a judgment in the amount of $150,000, together with costs and attorneys' fees accrued by FDIC. By order signed September 23, 1986, Judge Mahon established a new schedule, extending the discovery deadline until August 26, 1987, resetting the pretrial conference for September 9, 1987, and resetting the trial for September 21, 1987.[5]

On July 24, 1987, FDIC filed a motion for leave to amend and join Trinity–Western, George A. Day (hereinafter "Day"), and Dickehut as additional defendants. The motion, which was signed by T. Ray Guy (hereinafter "Guy") as attorney for FDIC, gave the following explanation why Trinity–Western, Dickehut and Day should be made defendants:

> 2. Through discovery, Plaintiff FDIC has ascertained that additional parties

---

**3.** Apparently the parties reached an agreement that allowed the foreclosure to be conducted. *See* Motion for Leave to Amend and Join Additional Parties Defendant (filed 7/24/87) at 2.

**4.** At the point in time when this ruling was made, Judge Mahon was "entitled to assume, unless ... the contrary [was] unmistakeably apparent, that

[FDIC was] acting reasonably and in good faith." *Thomas v. Capital Sec. Servs. Inc.*, 836 F.2d 866, 881 (5th Cir.1988) (*en banc*).

**5.** This rescheduling and some of the later ones were done on the motion of one or more of the parties.

should be joined as parties, including: George Day, who received more than $700,000.00 out of the proceeds of a loan against the building's equity, which was available (Plaintiff FDIC alleges) because Defendant Calhoun purchased the building for substantially less than its market value; Gayle Dickehut, who prepared settlement statements that (Plaintiff alleges) negligently misrepresented the application of the proceeds of the loan; and Trinity–Western Title Company, who [sic] issued the mortgagee title policy for the transaction, who [sic] had designated Dickehut as an agent authorized to close transactions and disburse proceeds thereof, and certified the misleading settlement statements.

3. The parties whose joinder are [sic] sought hereby are being sued on grounds other than those which were apparent at the time suit was originally filed, the merits of which have been learned through post-filing discovery.

Motion for Leave to Amend and Join Additional Parties Defendant and Brief in Support Thereof at 2.

The same day the motion for leave was filed, Judge Mahon signed an order granting the requested leave, which resulted in the filing of the 1st Amended Complaint that day. By order signed July 29, 1987, Judge Mahon, because of his prior association with one of the parties to this action, transferred the action to the docket of District Judge David O. Belew, Jr. Trinity–Western answered the 1st Amended Complaint on August 14, 1987. Discovery resumed after the case was transferred to Judge Belew's docket. Three more notices of deposition were filed within a few months thereafter.

A third scheduling order was signed October 7, 1987, by Judge Belew, which extended the discovery deadline to March 4, 1988, fixed a pretrial order due date of March 18, 1988,[6] and a new trial date of April 4, 1988. On February 12, 1988, Trinity–Western filed a Rule 68 offer of judgment, offering to give FDIC a judgment against Trinity–Western in the amount of $10,000, together with costs

incurred, but not including attorneys' fees. By order signed February 25, 1988, Judge Belew, for the fourth time, extended the discovery deadline, this time to September 9, 1988, and reset the pretrial order due date for September 26, 1988, and the trial date for October 11, 1988. Then, by order signed September 6, 1988, Judge Belew, for the fifth time, fixed a new pretrial order due date of January 27, 1989, and a new trial date of February 6, 1989. Discovery was not extended by that order.

Next, on September 20, 1988, FDIC and Mutual filed a joint motion to dismiss with prejudice, advising the court of a settlement between those parties. The motion was accompanied by a compromise and settlement agreement between FDIC and Mutual that contemplated payment to FDIC by Mutual and its insurer of less than Mutual had offered when it made its July 1986 Rule 68 offer of judgment. Included in the agreement was the following explanation of the settlement payment:

F. Mutual and its insurer Southern Guaranty Title Company agree to pay an amount representing their future probable costs of litigation (in the total amount of $145,000.00) to the FDIC in settlement of all claims herein between the parties named herein.

Compromise and Settlement Agreement at 2. Mutual was dismissed from the action by order signed by Judge Belew on October 12, 1988.

A new order, the sixth, setting schedule for disposition of the case was signed by Judge Belew on November 16, 1988. It fixed a new discovery cutoff date of March 9, 1990, a new pretrial order due date of March 23, 1990, and a new trial date of April 9, 1990. The docket does not reflect any activity in this case throughout the year 1989.

Activity resumed in early 1990 with the filing by Trinity–Western of its designation of expert witness. On February 7, 1990, FDIC filed the 2nd Amended Complaint, which Trinity–Western answered on February 12, 1990. Then, on March 19, 1990,

---

**6.** The form of order used by Judge Belew in setting cases required that the parties file a pretrial order by a date certain and that, if needed, counsel should make arrangements for a pretrial conference to be held at least three days before the scheduled trial date.

Judge Belew signed an order setting, for the seventh time, a schedule in this case, this time fixing a new pretrial order due date of November 30, 1990, and a new trial date of December 17, 1990. Thereafter there was virtually no activity in this case for six months, when, on September 12, 1990, Judge Belew signed an order extending discovery until November 16, 1990, but that order was vacated by order signed by Judge Belew September 19, 1990. In September 1990, sixteen more notices of deposition were filed.[7]

On December 10, 1990, Judge Belew signed yet another scheduling order, the eighth one, this time resetting the case for trial for April 29, 1991. Judge Belew signed an order on April 23, 1991, dismissing FDIC's claims against Financial because, although Financial had been in default since October 1985, FDIC had never moved for default judgment. Next, on April 24, 1991, FDIC moved for dismissal of defendant Dickehut without prejudice. In the latter part of April 1991 there was significant activity by the parties in anticipation of trial on April 29, 1991.

The day the case was to go to trial, Judge Belew announced that he had an acquaintanceship with one of the principals of Trinity–Western, and he invited the parties to ask for recusal if any of them was uneasy with his continued participation. One or more parties requested recusal; and, by order signed April 29, 1991, the action was transferred to the docket of the undersigned judge.

By order signed April 30, 1991, the court granted FDIC's motion to dismiss Dickehut from the action, and FDIC's claims against her were dismissed without prejudice. The case was tried non-jury on May 2, 3, and 4, 1991. At the request of FDIC, the claims and causes of action it was asserting against Calhoun were dismissed by order from the Bench on May 1, 1991, which was confirmed by written order signed May 8, 1991. This left Trinity–Western and Day as the only defendants when the trial concluded.

On May 9, 1991, after having heard argument of counsel, the court ordered that a take-nothing judgment be entered in favor of Trinity–Western and Day and dictated into the record findings and conclusions, which, as to the claims against Trinity–Western, are as follows:[8]

(1) The court adopted as findings of fact all facts set forth under the heading "Statement of Stipulated Facts" in the Proposed Joint Pretrial Order filed April 26, 1991, which are set forth in Appendix "A" to this memorandum opinion and order.

(2) The court adopted as findings of fact all facts set forth in the Stipulation of Facts filed May 3, 1991, a copy of the text of which is attached to this memorandum opinion and order as Appendix "B."

(3) This action was not brought or prosecuted as a derivative action.

(4) FDIC stands in the place of Bank, and its rights are no greater than those of Bank.

(5) If Bank had no right, title, or interest in the claims asserted in this action, then neither has FDIC.

(6) FDIC is subject to whatever defenses Bank would have been subject to as to the claims that are being asserted by FDIC in this action.

(7) Under Texas law, a shareholder cannot directly recover damages for an injury to the corporation, and that is true even where the shareholder suffers a loss because of an injury caused to the corporation, including the diminution in the value of the shares of the corporation. For that reason, Bank had no right of action, or cause of action, based on alleged injury suffered by its subsidiary, Corp. The fact that the shareholder of a corporation owns 100 percent of the shares does not change the situation; and, such a shareholder cannot directly sue for the loss suffered by the corporation notwithstanding 100 percent ownership. These rules apply to a situa-

---

7. These notices were filed after the September 12, but prior to the September 19, order regarding extension of the discovery deadline.

8. The court is not listing findings and conclusions that are applicable only to FDIC's claims against Day.

tion where a director or officer misappropriates a corporate asset, thus diminishing the value of the corporation. The law treats the corporate body as an injured party in that circumstance, as well as other circumstances, and does not treat as the injured party the individual stockholder who has lost the value of his stock. If there has been such a loss in this case, the loss was by Corp., and not Bank as its sole shareholder. Based on the foregoing conclusions, FDIC, standing in the place of Bank, as it does in this action (assuming that it owns the shares of Corp.), has no standing to sue directly for recovery of a loss arising out of the disputed transactions.

(8) Inasmuch as FDIC has not sued derivatively on behalf of Corp., it has no cause of action arising out of the transactions in question on which to sue in this action. The only complaints that have been made by FDIC in this action are as to transactions that caused damage to Corp. Consequently, FDIC, as a claimant through Bank, has no right to bring action based on the claims asserted in this case.

(9) On July 26 and 27, 1984, Bank was solvent. The disputed transactions did not cause Bank to be rendered insolvent. On June 20, 1984, the financial conditions of Bank was sound enough to enable Bank to declare a dividend to its sole shareholder of $74,160.02, and such a dividend was, in fact, declared and paid. The financial conditions of Financial, Bank, and Corp. were such throughout the month of July 1984 that an amount equivalent to the amount of benefits Calhoun received from the disputed transactions (including any benefits that Day or others might have received through Calhoun as a consequence of the disputed transactions) could have been declared and paid by Corp. to Bank, then from Bank to Financial, then from Financial to Calhoun, without causing any of the corporations to be rendered insolvent. The evidence does not establish that the making of the transactions in question caused Corp., Bank, or Financial to be rendered insolvent or to have suffered any legally recognizable harm or damage.

(10) Calhoun, in a sense, was dealing with himself in conducting and making the disputed transactions and, for all practical purposes, was the sole shareholder of all the entities involved.

(11) There was a legitimate business reason for the making of the disputed transactions that provided a benefit to Corp., Bank, and Financial.

(12) There was sufficient disclosure to the banking authorities (specifically the Federal Reserve Board in July 1984, the State Banking Commission in September 1984, and the Comptroller of the Currency in July 1984) to make the regulatory authorities aware of the general nature of the disputed transactions and to give the authorities enough notice that, if they had any concern with the transactions, they could have fully explored and learned of all the details of the transactions. The regulatory authorities were not troubled with the disputed transactions, and would not have been troubled with the disputed transactions had they known more of the details, or all of the details, concerning the transactions, taking into account the ownership situation of the three corporations in question and the solvency of the Bank as it existed in June and July of 1984.

(13) There was no fraud on the creditors because Bank, Corp., and Financial were all solvent at the time, and after completion, of the disputed transactions. There was no fraud on the regulatory authorities in reference to the disputed transactions for the reasons previously stated. There was no wrong committed in the disputed transactions of which Bank, Corp., or Financial had any right to complain, or that gave rise to any cause of action on behalf of any of those entities that could be asserted by FDIC in this action.

(14) There was no claim against Trinity–Western of any loss or damage resulting from the terms and conditions of the new lease that was entered into.

(15) Bank and Corp. approved and ratified the disputed transactions. The board of directors of Corp. authorized the sale of the property to Calhoun for $2,500,000. Bank, the 100 percent shareholder of Corp., approved a resolution on June 20,

1984 (at a time when Calhoun was not voting), that approved the sale, by its subsidiary, of the property to Calhoun for $2,500,000. The disputed transactions were reported to Bank's board of directors in August 1984, and its board of directors at that time ratified the transactions. Corp.'s board of directors ratified, adopted and confirmed the disputed transactions by their ratification, adoption, and confirmance of the actions of the officers of the corporation during the year 1984.

(16) Trinity–Western was not under a duty to protect Bank from any alleged misconduct of Calhoun or from the incompetence or negligence of the directors of Bank in the transfer of the property in question. Trinity–Western did not have a duty to protect Bank with respect to the transactions which were conducted and authorized by the officers and directors of Bank.

(17) The evidence does not establish that any conduct on the part of Trinity–Western was a proximate cause of any loss or harm suffered by Corp., Bank, or Financial.

(18) The evidence does not establish that Trinity–Western, acting through its agents, could have foreseen that any loss or damage would be suffered by any of the corporate entities by any conduct on the part of any agent or representative of Trinity–Western.

(19) The evidence does not establish that Mutual would not have made the loan in question if it had had more knowledge concerning the facts of the loan. The evidence does not establish that the conduct of Trinity–Western made a difference one way or the other as to whether Mutual would have made the loan. The evidence does not establish that Trinity–Western could have foreseen that things it, through its agents, did would have made any difference as to whether Mutual would have made the loan. The evidence does not establish that Mutual made the loan on the basis of a $4,000,000 purchase price or that the loan would not have been made if it had known that the purchase price was less than that. The evidence does not establish that Calhoun would not have

been successful in obtaining a loan from another source if Mutual had not made the loan. There is no reason to disbelieve Calhoun's testimony that he felt that he could obtain the loan from another source.

(20) The evidence does not establish that Dickehut, as agent for Trinity–Western, knew or should have known that there was the potential that anything she did would cause any harm or damage to Corp., Bank, or Financial. She was acting as authorized agent for Trinity–Western when she prepared the Exhibit "33" closing statement and made the changes in it to cause it to become what was received in evidence as Exhibit "34."

(21) The evidence does not establish that Dickehut failed to exercise that degree of care that a person situated as she was on the occasion in question would have exercised.

(22) The evidence does not establish that the conduct of Dickehut was a proximate cause of any loss or damage suffered by Corp., Bank, or Financial.

(23) FDIC has no right of recovery against Trinity–Western under count three of the 2nd Amended Complaint, and judgment should be entered in favor of Trinity–Western, denying FDIC any recovery from Trinity–Western.

The final judgment in this action was signed May 9, 1991. On June 14, 1991, the court signed an order overruling FDIC's motion for new trial and to alter or amend judgment. Next, on July 9, 1991, FDIC filed its notice of appeal from the May 9, 1991, judgment and the order overruling the motion for new trial. After twenty-five volumes of record, consisting of thousands of pages, had been prepared by the Clerk of this court and transmitted to the Clerk of the Court of Appeals, FDIC filed a motion on January 10, 1992, to dismiss the appeal. The Fifth Circuit dismissed the appeal by entry of dismissal signed January 10, 1992.

### III.

*The Requests of Trinity–Western for Sanctions/Attorneys' Fees*

In the answer Trinity–Western filed February 12, 1990, in response to the 2nd

Amended Complaint, it asserted that the allegations of the 2nd Amended Complaint are frivolous, without merit, and brought in bad faith and for purposes of harassment, and that the court should impose sanctions under Fed.R.Civ.P. 11. The prayer of this answer sought recovery of "attorneys' fees against the plaintiff or those responsible for filing this lawsuit, as set out in Fed.R.Civ.P. 11." Answer of Trinity–Western Title Company, with Special Defenses to Plaintiff's Second Amended Complaint at 9–10. In the Proposed Joint Pretrial Order filed April 26, 1991, Trinity–Western reasserted that the allegations made by FDIC in its 2nd Amended Complaint "are frivolous; are without merit; and are brought in bad faith and for purposes of harassment" and that "[t]he Court should impose sanctions under Fed. R.Civ.P. 11." Proposed Joint Pretrial Order at 7.

By order signed May 9, 1991, the same day the court signed the final judgment in this action, the court fixed a schedule for the filing by Trinity–Western of a formal motion for Rule 11 sanctions. Trinity–Western complained in its motion, which was filed on May 15, 1991, of the 1st Amended Complaint, which was signed by Guy on behalf of FDIC, and the 2nd Amended Complaint, which was signed by Cathy Ries (hereinafter "Ries") on behalf of FDIC, asserting that there was no basis warranted by existing law for the filing of either version of the complaint against Trinity–Western, with the consequence that, in each instance, the signing attorney violated the certifications deemed by Rule 11 to have been made at the time of signing. On July 23, 1991, Trinity–Western filed its supplement regarding motion for sanctions by which it added 28 U.S.C. § 1927 as a basis for imposing sanctions, and urged that, on the basis of § 1927, sanctions be imposed against Jenkens & Gilchrist jointly and severally with Guy, Ries, and FDIC.

On January 10, 1992, the day on which FDIC dismissed its appeal, Trinity–Western filed its request for attorneys' fees under 28 U.S.C. § 2412. First, it contended that § 2412(b) is applicable, arguing that FDIC, as an agency of United States of America, should be liable, the same as any other party, by reason of the common law principle that a successful party can recover attorneys' fees from the losing party if the latter has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. Second, it argued that § 2412(d)(1)(A) applies because, according to Trinity–Western, FDIC's suit is based on an assignment of a tort cause of action, rather than the tort cause of action itself, and that there is no basis for the court to find that the position of FDIC was substantially justified or that special circumstances make an award of attorneys' fees against FDIC unjust.

IV.

*Rule 11 and Basic Guidelines Established by the Fifth Circuit for its Application*

The pertinent parts of Fed.R.Civ.P. 11 read as follows:

**Rule 11. Signing of Pleadings, Motions, and Other Papers; Sanctions**

Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name ... The signature of an attorney ... constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

Rule 2.1(f) of the Local Rules of the United States District Court for the Northern Dis-

trict of Texas reminds members of the bar of this court of their Rule 11 obligations and warns that "[t]he provisions of Rule 11 of the Federal Rules of Civil Procedure will be strictly enforced."

■ Affirmative duties imposed by Rule 11 on a signing attorney were reiterated by the Fifth Circuit in *Thomas v. Capital Sec. Servs., Inc.:*

> It is well established that Rule 11 imposes the following affirmative duties with which an attorney or litigant certifies he has complied by signing a pleading, motion, or other document.
>
> > (1) that the attorney has conducted a reasonable inquiry into the facts which support the document;
> >
> > (2) that the attorney has conducted a reasonable inquiry into the law such that the document embodies existing legal principles or a good faith argument "for the extension, modification, or reversal of existing law;" and
> >
> > (3) that the motion is not interposed for purposes of delay, harassment, or increasing costs of litigation.

836 F.2d 866, 873–74 (5th Cir.1988) (*en banc*). "... Rule 11 applies to each and every paper signed during the course of the proceedings and requires that each filing reflect a reasonable inquiry." *Id.* at 875. "Rule 11's central purpose is to deter baseless filings and streamline the administration of justice." *Spiller v. Ella Smithers Geriatric Center,* 919 F.2d 339, 345 (5th Cir.1990) (citing *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 393, 110 S.Ct. 2447, 2454, 110 L.Ed.2d 359 (1990)).

---

**9.** Each of the issues with respect to which the court made findings and conclusions should have been the subject of meaningful legal inquiry before Trinity–Western was made a defendant.

**10.** The court is mindful of the Fifth Circuit's admonition in *Thomas* that "sanctions must be imposed within a time frame that has a nexus to the behavior sought to be deterred." 836 F.2d at 881. Pointed to the instant action is the explanation in *Thomas* that:

> We recognize that the drafters of Rule 11 contemplated that, in the case of pleadings, the sanctions issue normally will be determined at the end of the litigation. Fed.R.Civ.P. 11 advi-

■ A proper construction of Rule 11 is one "which evaluates an attorney's conduct at the time a 'pleading, motion, or other paper' is signed." *Thomas,* 836 F.2d at 874. "... Rule 11 review focuses upon the instant when ... the signature is placed on the document." *Id.* at 874. A "series of filings may indicate a pattern of attorney conduct of some consequence." *Id.* at 875. Of course, all the relevant circumstances surrounding the litigation should be taken into account in the determination of whether there was a Rule 11 violation when the signature was placed on the document. The violation can, and normally would, be proved by circumstantial evidence. Rule 11 compliance is determined by an objective, not subjective, standard of reasonableness under the circumstances. *Id.* at 873. An attorney's good faith does not protect him or her from Rule 11 sanctions. *Id.*

## V.

### *Rule 11 Has Been Violated*

In making the Rule 11 evaluations in this action, the court has not limited its inquiry to the precise complaints made by Trinity–Western, but has taken into account, as well, the contentions made on behalf of FDIC in the pretrial order and the broad range of issues that should have been subject of inquiry[9] by counsel for FDIC before the signing of either of the amended complaints or the pretrial order. Because of the size of the record in this action, and the large volume of items filed by the parties on the issues raised by Trinity–Western's requests for sanctions and for recovery of attorneys' fees, the evaluation process has been tedious and time-consuming.[10]

---

sory committee notes. Thus, by our opinion today, we do not mean to imply that withholding a sanctions decision until the end of trial is in all instances inappropriate.... For instance, a determination of whether or not a pleading is well grounded in law ... may not be feasible until ... after the parties have presented their case at trial....

*Id.* Shortly after the trial of this action was concluded, the undersigned judge directed the parties to make detailed filings on the issue of Rule 11 sanctions. The parties have not been led by this judge to believe that all has been well and that business could proceed as usual. Exercise by a judge of care in the sanction decision is not

The reactions of the undersigned judge after the trial of this action was concluded in May 1991 were that the conduct of FDIC and its attorneys in pursuing this action was outrageous and that there was no possible justification for the infliction on Trinity–Western or the judicial system of such unmeritorious litigation. Since then, the court has carefully tested those initial reactions in the light of the provisions of Rule 11 and the court decisions that have interpreted it and by a study of the entire record of this case, including, of course, the many filings the parties have made on the subjects of whether sanctions should be imposed or attorneys' fees awarded. The court has considered and weighed carefully the oral arguments made at the hearing held October 29, 1992. Throughout, the court has given FDIC and its counsel the benefit of the doubt. But, the court regretfully adheres to its initial reactions.

■ When the principles expressed in *Thomas* concerning reasonable-inquiry-into-the-facts [11] are applied to this action, the court cannot find that there was a fact-based Rule 11 violation. To the contrary, the court is satisfied that FDIC and its counsel were aware of all pertinent facts before the 1st Amended Complaint was signed, and they certainly were aware of those facts before the 2nd Amended Complaint and the Proposed Joint Pretrial Order were signed.

■ However, the court has concluded that neither of the signing attorneys (Guy as to the 1st Amended Complaint and Ries as to the 2nd Amended Complaint and Proposed Joint Pretrial Order) conducted reasonable inquiry into the law such that the document signed by the attorney embodied claims against Trinity–Western that were based on existing legal principles or a good faith argument for the extension, modification, or reversal of existing law.

■ Factors that can be considered in the determination of whether a reasonable inquiry into the law has been made were expressed by the Fifth Circuit in *Thomas* as follows:

> As to the determination of whether a reasonable inquiry into the law has been made, a district court may consider the time available to the attorney to prepare the document; the plausibility of the legal view contained in the document; the pro se status of a litigant; and the complexity of the legal and factual issues raised.

*Id.* at 875–76. A district court's decision to impose sanctions may turn on whether the document at issue was based on a "plausible view of the law." *Uithoven v. U.S. Army Corps of Engineers,* 884 F.2d 844, 846 (5th Cir.1989).

There has been no suggestion by FDIC or its counsel that counsel did not have sufficient time to conduct full legal inquiry before the documents were prepared. The Guy and Ries affidavits that FDIC filed as part of its initial response to Trinity–Western's motion for sanctions under Rule 11 indicated that full legal inquiry was made. Guy said that prior to the filing of the 1st Amended Complaint he "made inquiry into ... the law applicable to *all of the claims* being asserted therein against Trinity–Western Title Company, which inquiry included a review of ... case law and statutes regarding the claims being made." [12] He went on to say that "prior to the filing of the Plaintiff's Second Amended Complaint I again engaged in inquiry into ... the law applicable to *all of the claims* being asserted therein against Trinity–Western Title Company, which inquiry in-

---

a factor that weighs in favor of the party or attorney who is the potential subject of a sanction.

**11.** The Fifth Circuit said in *Thomas* that:

> The determination of whether a reasonable inquiry into the facts has been made in a case will, of course, be dependent upon the particular facts; however, the district court may consider such factors as the time available to the signer for investigation; the extent of the attorney's reliance upon his client for the factual support for the document; the feasibility of a prefiling investigation; whether the signing attorney accepted the case from another member of the bar or forwarding attorney; the complexity of the factual and legal issues; and the extent to which development of the factual circumstances underlying the claim requires discovery....

*Id.* at 875.

**12.** Plaintiff's Response to Defendant's Motion for Sanctions Under Federal Rule of Civil Procedure Rule 11 and Brief in Support Thereof (hereinafter "Plaintiff's Initial Response"), Ex. "E" at 1 (emphasis added).

cluded ... review of case law and statutes regarding the claims being made." [13] Similarly, Ries said in her first affidavit that "[p]rior to the filing of the Plaintiff's Second Amended Complaint I engaged in inquiry into ... the law applicable to *all of the claims* being asserted therein against Trinity–Western Title Company, which inquiry included a ... review of case law and statutes regarding the claims being made." [14]

But, somewhat different versions of the scope of legal inquiry were given by Guy and Ries in their second affidavits, which FDIC filed when it complied with the directive of the court's June 18, 1991, order that FDIC provide affidavits of its attorneys reflecting the research they did on controlling legal issues and evidencing "any other matter plaintiff believes is relevant to a determination of the motion for sanctions." June 18, 1991, Order at 2. Guy admitted that neither he nor any other lawyer within his firm conducted research on legal issues that were vitally important to the claims FDIC made against Trinity–Western. He said that the results of the legal research that was done were put in a memo done by David Dyer, an associate of Guy's firm.[15] Ries's second affidavit is a virtual admission by her that when she signed the 2nd Amended Complaint she had not conducted any significant research into the law applicable to the claims that were being asserted in that document against Trinity–Western. She said that she did

make a "review of some of the research contained in the file on the case at that time, particularly the legal memoranda [sic] prepared by David Dyer and by having further research performed by other associates with the firm." [16] However, no information was provided relative to the "further research," and the record indicates that the only legal memorandum prepared by any·lawyer for FDIC relative to the law applicable to FDIC's claims against Trinity–Western was the one prepared by Dyer.

When the Dyer memorandum was produced pursuant to order of the court, the inadequacy of FDIC's legal inquiry became more apparent. The memorandum shows that the legal research conducted before the 1st Amended Complaint was filed was so shallow that it would be virtually useless in the evaluation of the merits of a claim by FDIC against Trinity–Western. The research was predicated on such a skimpy set of assumed facts that its results had no meaningful relationship to the facts pertinent to this action, which were then known to FDIC and its counsel.[17] The issues that were defined for research were so remote from the ultimate question of whether there was a legal basis for a contention that Trinity–Western had liability to FDIC that no legal conclusion could be reached, or was even sought, on that question of overriding importance.[18] The appearance is that FDIC

13. *Id.* at 2 (emphasis added).

14. Plaintiff's Initial Response, Ex. "F" at 1–2 (emphasis added).

15. Affidavit of T. Ray Guy with Respect to Jenkens & Gilchrist's Research Regarding Claims, filed July 16, 1991.

16. Affidavit of Cathey Gribble Ries, filed July 16, 1991, at 2.

17. The Dyer memorandum gives as the assumed facts upon which Dyer's research was predicated the following:

### FACTS
In 1985 Larry Calhoun, president of Northwest Bank, purchased the bank's building and leased it back to the bank. Calhoun financed the purchase price through Mutual Building & Loan Association. Trinity Western Title Company closed the loan from Mutual to Larry Calhoun. George Day acted as "closing attor-

ney" at the closing. The closing took place in Mr. Day's office.
In October of 1985, Mutual foreclosed on the building and now holds record title. The FDIC has sued Calhoun for fraud in connection with the sale and lease-back transaction. The FDIC has also sued Mutual in an effort to have Mutual's title to the property set aside and title returned to the FDIC as receiver for the bank. The FDIC has discovered that Calhoun and Day may have received at the closing $1.5 million of the loan proceeds intended for the purchase of the building.
Memorandum dated October 10, 1986, accompanying Certificate of Service filed September 5, 1991, (hereinafter "Dyer memo"), at 1.

18. The only legal issues researched by Dyer, and the "short answers" he gave to those issues were set forth in his memorandum as follows:
### ISSUES
1. Is there a cause of action for negligent misrepresentation in Texas? If so, what is the applicable Statute of Limitation?

and its counsel were seeking nothing more than superficial justification for the bringing of a suit against Trinity–Western without regard to the question of whether there was legal basis for such a suit under *all facts* known to FDIC and its counsel.

The general conclusions favorable to FDIC and its counsel that are expressed in the affidavits that were filed with FDIC's responses to Trinity–Western's motions lose whatever significance they otherwise might have had on the issues of the quantity and quality of legal inquiry conducted in reference to the potential claims against Trinity–Western when they are tested by the more specific affidavits and the contents of the Dyer memo. Reasonable legal inquiry into all areas of law applicable to the claims of FDIC against Trinity–Western was not conducted by anyone.[19] There was no legal inquiry that would cause a reasonable attorney to believe when the document was signed that the whole contents any of the documents in issue (the 1st Amended Complaint, the 2nd Amended Complaint, and the Proposed Joint Pretrial Order) embodied existing legal principles or a good faith argument for the extension, modification, or reversal of existing law insofar as the document purported to state or describe causes of action against Trinity–Western.

If proper inquiry into the law had been conducted by counsel for FDIC at any step along the way, counsel would have perceived that the outcome of this case would have been as it turned out to be. They would have realized that there was no realistic prospect of success under existing law or any good faith argument for the extension, modification, or reversal of existing law. Borrowing on language used by the Fifth Circuit when imposing sanctions under Fed.R.App.P. 38:

> With what independent judgment he determined that success on the facts could be obtained totally evades our imagination. . . .

*Coghlan v. Starkey,* 852 F.2d 806, 810 (5th Cir.1988).

The initial reaction of any reasonable attorney to the claims FDIC proposed to assert against Trinity–Western would have been that the likelihood of there being any merit to the claims would be extremely remote. That being so, a reasonable attorney should, and would, not have asserted such a claim without having first conducted thor-

---

2. Was the "closing attorney," George Day, an agent of Trinity Western Title Company?

3. What is the Statute of Limitation in Texas for fraud actions brought after adoption of the Texas Civil Practice & Remedies Code?

4. Can a seller of land sue the title company for violation of the DTPA?

**SHORT ANSWERS**

1. Yes; Texas courts have repeatedly allowed Plaintiffs to bring actions for negligent misrepresentation. The Statute of Limitations apparently is two years.

2. Unclear; I did not find any Texas case in which the court specifically discussed whether a "closing attorney" is an agent of the title company. However, the relationship of the "closing attorney" to the title company certainly appears to fit the requirements of an agency relationship in Texas.

3. Unclear; no Texas court has addressed whether the adoption of the Civil Practice & Remedies code changes the applicable Statute of Limitation for fraud actions. However, courts applying Article 5526 in recent cases have intimated that the new two-year statute (Section 16.003) applies to all actions formerly covered by Article 5526.

4. The case of *Fielder v. Able* establishes that a seller of real estate must *purchase the services* of the title company in order to be a "consumer" and, therefore, qualify to bring suit under the DTPA.

*Id.* at 2–3.

19. The court has not overlooked the assertions of previously undisclosed legal inquiry conducted by counsel for FDIC that were made by FDIC and its attorneys after the court announced by order signed October 4, 1992, the court's tentative conclusions that counsel for FDIC had violated Rule 11. In deciding the weight to give those assertions, the court has taken into account that they were not made in response to the May 9, 1991, and June 18, 1991, orders, the first of which gave FDIC a deadline of May 31, 1991, within which to make any response, including affidavits, it wished to make to any Rule 11 filings made by Trinity–Western, and the second of which ordered FDIC to file by July 5, 1991, affidavits executed by its attorneys reflecting research they did on specified legal theories and "any other matter [FDIC] believes is relevant to a determination of the motion for sanctions." June 18, 1991, Order at 2.

Even if all the claims of legal inquiry were accepted at face value, the fact would remain that the results of all the inquiry would not have persuaded a reasonable attorney that the claims against Trinity–Western had legal merit.

ough legal inquiry and having determined therefrom that the initial reaction was in error. Counsel for FDIC should have satisfied themselves that there was legal basis for the claims they brought against Trinity–Western. There is no indication that they conducted legal inquiry that would have enabled them to gain such a conviction. Using an objective standard, the court concludes that no reasonable attorney would have become persuaded that FDIC's claims against Trinity–Western had legal merit based on a reasonable inquiry into the law, much less based on the legal inquiry counsel for FDIC conducted.

The court has concluded that the only reasonable explanation that can be given for the conduct of FDIC and its attorneys in instituting this action against Trinity–Western (by the signing and filing of the 1st Amended Complaint) and in perpetuating it (by the signing and filing of the 2nd Amended Complaint and the Proposed Joint Pretrial Order) is that those things were done to harass Trinity–Western and to burden it with costs of litigation to the end of aiding FDIC in its attempts to extract an unwarranted settlement payment. "To determine whether a filing caused harassment, the focus is upon objectively ascertainable circumstances rather than subjective intent." *Sheets v. Yamaha Motors Corp. U.S.A.*, 891 F.2d 533, 538 (5th Cir.1990). The only objectively ascertainable explanation for the signing and filing of the documents at issue is that they were signed and filed for the improper purposes ascribed to them above.[20] While the signing attorneys did not make the settlement decision, their conduct in bringing and prosecuting this action against Trinity–Western created the setting that allowed FDIC to seek to virtually destroy Trinity-western by its unreasoned settlement demands. Dudley Beadles (hereinafter "Beadles"), the President of Trinity–Western, told in his affidavit of the use FDIC made of the pendency of this action:

7. During 1990, I made several attempts to settle this lawsuit with Mr. Kerry Williams of the FDIC. I travelled to Dallas and offered the FDIC $30,000 to settle this suit. Trinity–Western estimated that it would take at least $30,000 or more to prepare and try this case. Trinity–Western furnished complete financial statements to the FDIC showing that it did not have a net worth of much more than the $30,000 which was offered to settle this case. It also provided information concerning the value of our abstract plant in Tarrant County which was less than $6,000.

8. Mr. Kerry Williams advised me in late 1990 or early 1991 that our offer of settlement was unacceptable. When I asked him what amount of money would be acceptable to settle this lawsuit, he replied, "We don't work that way, you have to continue to make offers until we accept one." He stated that he thought Trinity–Western was worth more than $30,000.

Affidavit of Dudley Beadles, filed May 15, 1991, at 4.

The disposition FDIC and its counsel caused to be made of the claims asserted by FDIC against the other defendants tends to support the conclusion that less than reasonable forethought was given to the filing of the claims that had been asserted in this action and that questionable motives were involved.[21]

The court finds, and concludes, that:

(a) When Guy signed the 1st Amended Complaint in July 1987, he did so in violation of the certification requirements of Fed.R.Civ.P. 11. When he signed such document he had not conducted a reasonable inquiry into the law such that the document embodied existing legal principles or a good faith argument for the extension, modification, or reversal of existing law; and, such document was interposed for the purpose of harassment and

---

**20.** While the court has concluded that the documents were signed and filed with improper motive, such a conclusion is not essential to the ultimate conclusion that sanctions should be imposed. *See Robinson v. National Cash Register Co.*, 808 F.2d 1119, 1130 (5th Cir.1987).

**21.** In *Callahan v. Schoppe,* the Fifth Circuit, in the course of affirming Rule 11 sanctions, noted that the dismissal by the plaintiffs, who were sanctioned, of other defendants "evinces less than reasonable forethought in filing their lawsuit." 864 F.2d 44, 46 (5th Cir.1989).

to cause defendant Trinity–Western to be burdened with costs of litigation.

(b) When Ries signed the 2nd Amended Complaint in February 1990, she did so in violation of the certification requirements of Rule 11. When she signed such document, she had not conducted a reasonable inquiry into the law such that the document embodied existing legal principles or a good faith argument for the extension, modification, or reversal of existing law; and, such document was interposed for the purpose of harassment and to cause Trinity–Western to be burdened with costs of litigation.

(c) When Ries signed the Proposed Joint Pretrial Order in April 1991, she did so in violation of the certification requirements of Rule 11. When she signed such document, she had not conducted a reasonable inquiry into the law such that the document embodied existing legal principles or a good faith argument for the extension, modification, or reversal of existing law; and, such document was interposed for the purpose of harassment and to cause Trinity–Western to be burdened with costs of litigation.

## VI.

*Sanctions are Mandatory under Rule 11*

 The court must order appropriate sanctions if the court determines that the conduct of an attorney violates Rule 11. *Thomas,* 836 F.2d at 870, 876. As the Fifth Circuit has noted:

There are no longer any "free passes" for attorneys and litigants who violate Rule 11. Once a violation of Rule 11 is established, the rule mandates the application of sanctions.

*Id.* at 876. The court is not authorized to disregard Rule 11 violations because of good reputations enjoyed generally by counsel for FDIC, the relative youthfulness and inexperience of one of the attorneys for FDIC, or the potential that professional reputations might suffer blemishes from determinations that Rule 11 violations have occurred.[22] The Fifth Circuit's explanation in *Thomas* for the use of the word "shall" in Rule 11 includes the following:

When Rule 11 was amended in 1983 to include the mandatory "shall" language regarding the imposition of sanctions, the rulemakers inserted such language in an attempt to combat the reluctance of judges to impose sanctions on their fellow professionals. This reluctance on the part of the judiciary to impose sanctions has been explained as stemming from judges' sympathy, as former practitioners, for the pressures on lawyers in the adversarial system, concern that available sanctions would punish the client. . . . One commentator notes "[b]y making sanctions mandatory, the drafters of rule 11 sought to discourage any collegial inclination to overlook or minimize violations" and to "maximize the deterrent effect of sanctions." . . . The drafters of the amended rule employed mandatory language, thereby declining to afford district courts the discretion to conclude that sanctions are unwarranted and to deny them.

836 F.2d at 876. Nor can the court overlook the violations because the conduct of FDIC's counsel might well have been prompted to a degree by the willingness of the courts to give special dispensation to FDIC and related agencies.[23]

## VII.

*Factors to be Considered in Determining the Nature of the Rule 11 Sanctions to be Imposed*

 The Fifth Circuit has made clear that the district court "is vested with consid-

---

**22.** While the reputation of an attorney cannot determine whether a sanction should be imposed, the potential damage to an attorney's reputation and career is a factor that should be considered in determining the nature of the sanction. *Thomas,* 836 F.2d at 878.

**23.** FDIC and its attorneys have repeatedly reminded the court of special treatment FDIC and its related agencies have received from the courts, including what have become known as the "super power" defenses. The court recognizes that FDIC is afforded something of a special status; and, the court has taken into consideration in the court's findings and conclusions the decisions that have favored FDIC in those respects. Also, the court has noted that there is a limit on how far the courts will go to further the interests of FDIC. *See, e.g., Federal Deposit Ins. Corp. v. Ernst & Young,* 967 F.2d 166 (5th Cir.1992).

erable discretion in determining the 'appropriate' sanction to impose upon the violating party." *Thomas*, 836 F.2d at 877. In the final analysis, however, "the district court should utilize the sanction that furthers the purposes of Rule 11 and is the least severe sanction adequate to such purpose." *Id.* at 878. If the sanction is substantial in amount, type, or effect, the district court should make "specific factual findings determining whether the sanction is the least severe adequate to serve the purposes of Rule 11." *Akin v. O–L Investments, Inc.*, 959 F.2d 521, 535 (5th Cir.1992).

■ The ultimate purpose of Rule 11 is to deter "misuse and abuse of the litigation process." *Thomas*, 836 F.2d at 870. *See also id.* at 870, n. 2. Rule 11 itself signals certain of the rule's goals, *i.e.*, avoidance of harassment, "unnecessary delay", or "needless increase in the cost of litigation." Also, the rule includes compensation of the offended party as one of its goals by providing that an appropriate sanction "may include an order to pay the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee." In *Thomas*, the Fifth Circuit said that "the rule's goals [are] deterrence, punishment, and compensation." 836 F.2d at 879. One of the objects of the "deterrence" goal is to discourage "a powerful and wealthy party from bringing frivolous or vexatious litigation." *Id.* at 877. The sanctions "should also be educational and rehabilitative in character and, as such, tailored to the particular wrong." *Id.* In *Harmony Drilling Co. v. Kreutter*, the Fifth Circuit described the "multiple purposes of Rule 11" as being "the deterrence of future violations, and the education and rehabilitation of offending parties." 846 F.2d 17, 19–20 (5th Cir.1988). And, in *Spiller*, the Fifth Circuit said that "Rule 11's central purpose is to deter baseless filings and streamline the administration of justice." 919 F.2d at 345.

■ When applying sanctions under Fed. R.App.P. 38, the Fifth Circuit has recognized the importance of penalizing a party and the party's counsel "for needless consumption of [court] time and resources" and for "waste of [court] resources", *Coghlan*, 852 F.2d at 812, 815, and has said that a factor to be considered in the imposition of sanctions is unnecessary expenditure of the energy of the court and court staff to dispose of meritless litigation, thus delaying justice "for truly deserving litigants." *Foret v. Southern Farm Bureau Life Ins. Co.*, 918 F.2d 534, 539 (5th Cir.1990). Those same considerations would seem to be just as important in determining the nature of sanctions to be imposed under Rule 11.

■ Sanctions may range from the giving of an admonishment or reprimand to rather severe financial sanctions. *Thomas*, 836 F.2d at 877–78. A sanction enjoining an attorney from charging his client for the time the attorney spent in filing the offensive document is appropriate. *Markwell v. County of Bexar*, 878 F.2d 899, 903 (5th Cir.1989).

■ If expenses incurred by the offended party are considered, the elements of reasonableness and mitigation must be taken into account. The expenses reimbursed must "(1) be found to have been caused by a violation of Rule 11, and (2) be found to be reasonable." *Thomas*, 836 F.2d at 878–79. Bearing in mind the goals of Rule 11, " 'reasonable' does not necessarily mean actual expenses." *Id.* at 879. The "reasonableness" determination "necessarily embraces an inquiry by the court as to the extent to which the nonviolating party's expenses and fees could have been avoided or were self-imposed." *Id.* "A party seeking Rule 11 costs and attorney's fees has a duty to mitigate those expenses, by correlating his response, in hours and funds expended, to the merits of the claims." *Id.* If he fails to do so, the district court can, in its discretion, "either reduce the award accordingly, or in some instances, decline to award any expenses." *Id.* The offended party must give notice to the court and the offending party that a violation has occurred; and, failure to do so can cause the ultimate sanction award to be reduced. *Id.* However, in *Thomas*, the Fifth Circuit went on to explain:

In mandating prompt notice, we do not mean to impose upon litigants a duty of notification that requires written notice or notice through the formality of pleadings;

nor do we specify a particular time frame in which notice must be given by counsel. Notice may be in the form of a personal conversation, an informal telephone call, a letter, or a timely Rule 11 motion.

*Id.* at 880. Nevertheless, "prudence dictates that notice should be reduced to writing and given both to the court and the offending party." *Id.*

The offended party and the court are "ordinarily entitled to assume, unless and until the contrary is unmistakably apparent, that [the offending party] is acting reasonably and in good faith ..." *Id.* at 881. Also, the Fifth Circuit pointed out in *Thomas* that:

... when a court's *primary* purpose in imposing sanctions is to deter, not to compensate, a determination of the "reasonableness" of fees and expenses does not necessarily depend on the steps taken to mitigate those expenses by the Rule 11 movant. Rather, the relevant considerations become the conduct and resources of the party to be sanctioned.

*Id.* This is consistent with the observation of the Fifth Circuit in *Thomas* that:

... as to parties, financial penalties have been characterized as perhaps "the most effective way to deter a powerful and wealthy party from bringing frivolous or vexatious litigation".....

*Id.* at 877 (quoting *Donaldson v. Clark*, 819 F.2d 1551, 1557 (11th Cir.1987)). If a wealthy and powerful party is not deterred, it can use baseless litigation as a method of extorting undeserved settlement payments from financially disadvantaged opponents who would prefer to make a substantial settlement payment rather than to risk experiencing financial ruin by reason of the litigation expenses that would be likely to be incurred in the defense of the litigation, no matter how meritless it is.[24]

If the "lawsuit [is one that has] no foundation at all", a sanction in the form of an award of all defense fees is appropriate. *Bogney v. Jones*, 904 F.2d 272, 274–75 (5th Cir.1990). "[L]egal costs incident to the sanctions motion itself" are "properly awarded" as part of the sanctions. *Truck Treads, Inc. v. Armstrong Rubber Co.*, 868 F.2d 1472, 1475 (5th Cir.1989).

## VIII.

### The Mitigation Issue

The court has decided that the sanctions to be imposed in this action should have as their primary objective the deterrence of baseless filings and that such a purpose can best be accomplished by requiring FDIC to make a significant reimbursement to Trinity–Western for its litigation expenses. Therefore, "a determination of the 'reasonableness' of fees and expenses does not necessarily depend on the steps taken to mitigate those expenses" by Trinity–Western; "[r]ather, the relevant considerations become the conduct and resources of the party to be sanctioned." *Thomas*, 836 F.2d at 881. Nevertheless, bearing in mind that other goals should be served in the sanctioning process, the court has evaluated, and is taking into account to an appropriate degree, the status of the record as it bears on the issue of mitigation.

In the affidavit of Trinity–Western's counsel, David Broiles (hereinafter "Broiles"), that was filed July 23, 1991, (hereinafter "7/23/91 Affidavit") Trinity–Western's position on the mitigation issue was rather fully developed. On October 9, 1992, the court signed an order directing Trinity–Western to file an instrument setting forth in writing its position on the mitigation issues, *i.e.* why it did not file a motion to dismiss or a motion for summary judgment and why it did not expressly raise the possibility that Rule 11 sanctions would be appropriate until it filed its answer to the 2nd Amended Complaint in February 1990. Trinity–Western's response was filed October 23, 1992, in the form of another affidavit of Broiles. Bearing in mind the explanations given by the Fifth Circuit in *Thomas* concerning acceptable forms of no-

---

24. In the instant action, Mutual made a $145,000 settlement payment that represented "their future probable costs of litigation." Compromise and Settlement Agreement at 2. And, Trinity–Western was trying to settle the claims against it by making a $30,000 payment, which was estimated to be at least the amount that would be required "to prepare and try this case." Affidavit of Dudley Beadles at 4. FDIC declined to accept $30,000 from Trinity–Western because its representative "thought Trinity–Western was worth more than $30,000." *Id.*

tice, *id.* at 879, and the principle that Trinity–Western was "entitled to assume, unless and until the contrary is unmistakably apparent, that [FDIC was] acting reasonably and in good faith", *id.* at 881, and taking into account the specific factors mentioned in Trinity–Western's responses and the primary objective to be served by the sanctions, the court has concluded that Trinity–Western should recover most of its litigation fees and expenses.

Trinity–Western did not have full knowledge of pertinent facts until months had passed and a great deal of discovery was conducted. Moreover, FDIC did not need to be alerted again to the Rule 11 obligation of its counsel. It already had been told of the potential of Rule 11 violations by the motion Mutual had filed October 23, 1985, alleging that FDIC's complaint, as against Mutual, was "wholly frivolous and posited solely for the purpose of harassment and annoyance" and violated Rule 11, "which requires that a pleading be well-grounded in fact and be warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law." Defendant's [Mutual's] Motion for Expenses Pursuant to Rule 11 at 2. If there was a potential that the claims asserted by FDIC against Mutual violated Rule 11, certainly there was a grave risk that FDIC's claims against Trinity–Western would violate the rule.[25] When Trinity–Western filed its initial answer on August 14, 1987, it pointed out that the complaint failed to state a claim against it upon which relief could be granted, and it alleged, in so many words, that Trinity–Western owed no duty to Bank and that there was no causation. Answer of Trinity–Western Title Company at 11, 13 (¶¶ LIV, LX, LXII). Trinity–Western again alerted FDIC and

FDIC's counsel to its view of the merit of FDIC's claims by making an offer of judgment, pursuant to Fed.R.Civ.P. 68, on February 12, 1988, offering to allow FDIC to take a judgment against Trinity–Western in the amount of $10,000, together with costs incurred exclusive of attorneys' fees accrued by FDIC, on condition that an order of dismissal with prejudice be entered.

When FDIC and Mutual filed their joint motion to dismiss the claims against Mutual on September 20, 1988, they filed their compromise and settlement agreement, which recited that Mutual and its insurer were paying FDIC in settlement "an amount representing their future probable costs of litigation." Compromise and Settlement Agreement at 2. The order dismissing FDIC's claims against Mutual was signed October 12, 1988. On October 17, 1988, FDIC informed Trinity–Western of its intent to file an amended complaint dropping Mutual as a defendant. Approximately thirty days thereafter counsel for Trinity–Western wrote counsel for FDIC offering to settle FDIC's claims against Trinity–Western for $30,000, "which represent[ed] [Trinity–Western's] estimated cost of the trial." Appendix filed July 23, 1991, with Second Affidavit of David Broiles in Support of Trinity–Western's Motion for Sanctions (hereinafter "7/23/91 Appendix") at 286. The letter goes into some detail to explain why FDIC's claims against Trinity–Western were without legal merit.

On February 7, 1990, FDIC followed through with what it had indicated on October 17, 1988, it intended to do by filing its 2nd Amended Complaint dropping Mutual as a defendant. Eight days later, counsel for Trinity–Western sent a letter to counsel for FDIC, confirming a telephone offer made on

**25.** Counsel for FDIC are intimately acquainted with the use of Rule 11. On July 22, 1988, in litigation brought against them by Federal Savings and Loan Insurance Corporation (hereinafter "FSLIC"), FDIC's then sister agency, Jenkens & Gilchrist and individual members thereof, including John A. Gilliam and Guy, filed their answers in No. CA3–88–130–C, styled "Federal Savings and Loan Insurance Corporation v. Laurence B. Vineyard, Jr., et al." Appendix filed July 23, 1991, with Second Affidavit of David Broiles in Support of Trinity–Western's Motion for Sanctions at 166 and 184. In each answer

the allegation was made that FSLIC "filed the Complaint in contravention of its obligations under Rule 11" and requested the court "to impose appropriate sanctions, including, without limitation, [dismissal], costs and attorneys' fees." *Id.* at 182 and 200. (The request for dismissal was included only in the Answer of Jenkens & Gilchrist to First Amended Complaint.) In the same action, Jenkens & Gilchrist and the individual defendants, including Gilliam and Guy, each filed another answer on August 31, 1988, alleging a violation of Rule 11 against FSLIC. *Id.* at 207 and 226.

behalf of Trinity–Western to settle for $30,-000, and indicating that counsel for FDIC had said that he would try to respond to the offer by February 21. *Id.* at 299.

When Trinity–Western asserted in its February 12, 1990, answer to FDIC's 2nd Amended Complaint that the allegations of the amended complaint were frivolous, without merit, and brought in bad faith and for purposes of harassment, and that the court should impose sanctions under Fed.R.Civ.P. 11, it did so in the context of an answer in which it:

(a) denied that it or Dickehut had any obligation or duty to Bank or engaged in any transaction related to Bank (¶ 35);

(b) alleged that any knowledge obtained by Dickehut was obtained from the president of Bank and was imputed to Bank (¶ 35);

(c) denied that Dickehut or Trinity–Western was negligent, or had any duty to FDIC or to anyone from whom FDIC had received any cause of action or right (¶ 37);

(d) alleged that FDIC was not entitled to recover in the capacity in which it sued (¶ 41);

(e) alleged that Trinity–Western owed no duty to FDIC or Bank (¶ 43);

(f) alleged the facts upon which Trinity–Western relied in support of its contention that Bank consented to and approved the transaction (¶ 45); and

(g) sought recovery of "attorneys' fees against the Plaintiff or those responsible for filing this lawsuit, as set out in Fed. R.Civ.P. 11." (prayer).

Answer of Trinity–Western Title Company, with Special Defenses to Plaintiff's Second Amended Complaint at 5–10.

On February 21, 1990, counsel for Trinity–Western sent a letter to counsel for FDIC, confirming a telephone conversation they had that date during which FDIC's attorney told Trinity–Western's attorney that the former did not have a response to the settlement offer. 7/23/91 Appendix at 300. On March 19, 1990, Broiles again wrote Guy, this time transmitting to Guy financial information he had received from Trinity–Western. Broiles expressed surprise that he has not had a response to his offer to settle, and he advised

Guy that the offer was still outstanding. One of the reasons Broiles gave why FDIC should accept the $30,000 offer is that "[t]here is absolutely no liability that can be established against Trinity Western," *id.* at 307, and another was that "[y]ou surely cannot justify trying a case like this where you have no possibility of collecting any money." *Id.* at 308.

On August 27, 1990, the President of Trinity–Western, Beadles, wrote directly to Kerry Williams (hereinafter "Williams"), an official with FDIC, concerning settlement. Beadles transmitted to Williams a number of items to be considered in connection with possible settlement, including the settlement letters from Broiles to counsel for FDIC dated November 21, 1988, and March 19, 1990, respectively; and, Beadles told Williams that:

A careful review of the facts of this case will clearly show that the remaining defendants are not in any way liable to the F.D.I.C. in this case.

We again offer $30,000.00 in full settlement of all claims against Trinity–Western Title Company. This is the amount which we estimate the trial in December will cost us.

7/23/91 Appendix at 315. One of the things that accompanied Beadles' letter was a "Statement of Facts" concerning the positions of the parties, which contained, under the heading "Position of Trinity–Western Title Company", the following statements:

1. Northwest Bank did not own the land and building in 1984. It had not owned the land since 1978. The Bank was merely a *tenant* in the building in 1984.

. . . .

4. Since the Calhouns were the 100% owners of Northwest Financial, it made no difference as to whether the loan proceeds were distributed to Northwest Financial or Calhoun. He had *total* control of the funds either way.

. . . .

6. The FDIC contends that the Bank indirectly received and justifiably relied upon information negligently misrepresented by Trinity–Western Title Company in the 1984 loan transaction to its detriment.

The Bank, through its President and sole shareholder had full knowledge of the facts of the transaction. Relying upon the details of the real estate transaction submitted by the Buyer and Seller of the property did not constitute negligence.

7. Larry H. Calhoun, the owner, President, Chairman of the Board of Northwest Bank is *solely* responsible for any and all losses of Northwest Bank and those of its related corporation. The suit against Trinity–Western Title Company and the other defendants is merely a desperate attempt to collect something from somebody, even if they are innocent third parties. The legal expenses incurred by Trinity–Western Title Company in this matter have already exceeded $40,000.00. Trinity–Western gained nothing in this transaction. Larry H. Calhoun collected almost $3,000,000.00.

*Id.* at 317–18. Beadles continued his attempts to accomplish settlement, without success. *See* Affidavit of Dudley Beadles at 4 (quoted *supra* at 176).

By letter from Broiles to Guy dated December 6, 1990, Broiles said that Trinity–Western was still interested in making a settlement on the terms previously proposed, and expressed puzzlement over the way the matter of settlement had progressed, saying, *inter alia,* that:

> We do not believe there is any liability to your client. Certainly these factors have to be taken into account. We have made a settlement [based] upon the anticipated cost of litigation.

7/23/91 Appendix at 319. On February 9, 1991, Broiles wrote Guy again, still urging that Guy give him information about "the status of the potential settlement." *Id.* at 320. Broiles wrote a similar letter to Guy on February 22, 1991. *Id.* at 321.

FDIC's version of the settlement activities, which is related in the Fourth Affidavit of T. Ray Guy in Response to Motion for Sanctions, filed August 12, 1991, agrees in essential respects with the version of Broiles and Beadles. Guy's emphasis is on the fact that FDIC had not rejected Trinity–Western's settlement offer by December 1990 and that FDIC's account officer, Williams, and not FDIC's counsel of record, made the decision not to accept Trinity–Western's offer. The Guy affidavit gives credence to the ongoing nature until the eve of trial of Trinity–Western's settlement efforts and expectations, by explaining:

> In the spring of 1991, I was informed by the FDIC that its account officer, Kerry Williams, had made a final determination that he would not be able to recommend a $30,000 settlement to the appropriate FDIC committees, for the reason that he was unable to conclude from a review of the financial information that Trinity–Western's financial condition justified acceptance of such a low offer. Accordingly, our firm conducted final preparations for trial and conducted the trial of the case.

Fourth Affidavit of T. Ray Guy in Response to Motion for Sanctions at 5.

As previously noted, in the Proposed Joint Pretrial Order filed April 26, 1991, Trinity–Western reasserted that the allegations made by FDIC in its 2nd Amended Complaint "are frivolous; are without merit; and are brought in bad faith and for purposes of harassment" and that "[t]he Court should impose sanctions under Fed.R.Civ.P. 11." Proposed Joint Pretrial Order at 7.

Thus, Trinity–Western gave notice to FDIC and its counsel of the lack of legal merit of FDIC's claims against Trinity–Western on many occasions; and, there is no suggestion that FDIC or its counsel would have done anything different from what they ended up doing if Trinity–Western had put its notice in a different form or had given the notice at a different point in time or more often. In the meantime, Trinity–Western was diligently attempting to settle for its estimated cost of defense. Its efforts to minimize its litigation costs were reasonable and timely. As a seasoned litigant and as experienced counsel, FDIC and its counsel already knew exactly what counsel's obligations were under Rule 11 and the risks they were taking if counsel violated the rule. They were repeatedly told by Trinity–Western and its counsel that FDIC's claims were without legal merit, but that did not slow FDIC down in the pursuit of the baseless claims. The intent and purpose of the notifi-

cation requirements were fully satisfied by actions taken by and on behalf of Trinity–Western in this action. Anything else would have been but an idle formality because the record makes clear that FDIC and its counsel were determined to press forward as they did, without regard to protestations of Trinity–Western and its counsel, unless and until Trinity–Western increased its settlement offer. The allegations by Trinity–Western in its answer to the 2nd Amended Complaint were adequate to notify the court of the contention that Rule 11 had been violated.

■ The more difficult question concerns the failure of Trinity–Western to make a dispositive motion once its counsel had learned enough about the case to know that FDIC's claims against Trinity–Western were without legal merit. Trinity–Western did not file a motion to dismiss under Fed. R.Civ.P. 12(b)(6), nor did it file a motion for summary judgment under Fed.R.Civ.P. 56. Its reasons for not filing such a motion are set forth at pages 13–20 of Trinity–Western's Response to the October 9, 1992, order (filed October 23, 1992) (hereinafter "10/23/92 Response"). The principal reason given is that, though Trinity–Western and its attorneys discussed several times the filing of a motion for summary judgment, "[t]he decision was made that the least expensive, most effective way to dispose of the case was to settle it on the same basis as Mutual had settled, by an offer of estimated trial costs or nuisance value." 10/23/92 Response at 13. Trinity–Western explained why it did not file a motion for summary judgment before late 1990 by saying:

4.1.2. Trinity–Western did not want to spend money filing a motion for summary judgment. The expenses could be considerable. A successful motion probably would be appealed, and the cost of a successful motion and appeal would probably exceed $30,000. The chance of success could not be predicted. It was not thought the offer already made could be lowered, so if the case settled the money preparing and filing a motion for summary judgment would be wasted.

4.1.3. Dudley Beadles was told by Kerry Williams, the FDIC representative with whom he negotiated directly in the spring of 1990, that Mr. Williams would recommend the settlement.

4.1.4. All parties at the local level, by the fall of 1990, expected the case to settle, so a motion would have wasted money. *Id.* at 13–14.

Trinity–Western then explained its failure to file a motion for summary judgment after late 1990 by pointing to its ongoing settlement efforts. In the late summer of 1990 the local representative of FDIC told Beadles, as President of Trinity–Western, that he would recommend that a settlement be made for the amount proposed by Trinity–Western, but final word from the various FDIC committees that made the ultimate settlement decision was not forthcoming.[26] Trinity–Western summed up by explaining that:

4.4 Trinity–Western did not file a dispositive motion prior to trial because it believed this case would be settled for $30,000, which it had offered continuously from November 1988 prior to trial preparation. Trinity–Western was led to believe

---

**26.** A joint request to extend time and for continuance was filed November 30, 1990. It stated:

2. The FDIC and Defendant Trinity Western Title Company had earlier reached a tentative settlement that would, if approved by the appropriate FDIC committees in Dallas and Washington, result in the release and dismissal of Defendants Trinity Western Title Company and Gayle Dickehut. The process of presenting the proposed settlement to the appropriate FDIC committees was initiated by the FDIC in time for final consideration thereof prior to the trial setting herein. However, the process was not completed because of a lack of certain information needed for committee evaluation. Accordingly, the written recommendation for settlement will need to be supplemented, and the settlement re-submitted for committee approval, and final consideration thereof cannot be obtained before the December 17 trial setting.

3. Plaintiff FDIC and Defendant Trinity Western still desire to attempt to consummate the proposed settlement. If the proposed settlement is re-submitted and approved, the trial of this case would be substantially simplified, and it would not be necessary for Trinity Western and Gayle Dickehut to undergo the trouble and expense of participating in preparation for trial and the trial of this case.

Motion for Continuance and Extension of Time to File Pretrial Order, filed 11/30/90, at 2.

settlement was recommended. The FDIC and Trinity–Western told the Court settlement was probable and would be most cost effective. Trinity–Western did as little as it could on this case from April 1988 to April 1991 hoping for a settlement. In April 1991 Trinity–Western, without any explanation why the FDIC did not accept its offer, prepared for trial.

*Id.* at 18.

A secondary reason given by Trinity–Western in the 10/23/92 Response for not filing a dispositive motion was that the then presiding judge's schedule was almost totally consumed with the trial of three major cases from late 1987 through late 1990.[27] Trinity–Western's point is that Judge Belew had a very busy schedule that could have caused difficulty in disposing of a dispositive motion if one had been filed.

Except to mention a motion to dismiss that was made orally by counsel for Trinity–Western on May 1, 1991, as the trial on the merits was commencing, Trinity–Western does not direct specific discussion to its failure to file a motion to dismiss, though its reasons for not filing a motion for summary judgment would seem to apply as well to a motion to dismiss.

While the court considers Trinity–Western's reasons for not filing a dispositive motion to be plausible, the court is not satisfied that Trinity–Western was justified in not filing such a motion. Whether the presiding judge would or would not find the time to consider and decide such a motion is not determinative. The judge should have been given a chance to make a summary ruling on the legal merits of the claims. The fact that Trinity–Western thought its financial interests would best be served by not filing such a motion does not provide the answer because, first, it would be able, at least theoretically, to recover reasonable costs incurred by it from FDIC and/or its counsel by way of sanctions, and, second and more importantly, the interests of the court would best be served, again at least theoretically, if the court were to be given an opportunity before trial to test the legal merits of FDIC's claims against Trinity–Western. If Trinity–Western had filed a dispositive motion at any time after 1987, and if the presiding judge had been able to find the time to consider and decide the motion, presumably the litigation would have been brought to an end before trial, and valuable judicial resources would have been preserved.

There is no way to select a precise point in time when a dispositive motion should have been filed by Trinity–Western or when, if ever, it would have been granted. However, the court must assume that the presiding judge would have found the time to consider and rule on the motion if one had been filed and that it would have been granted at some point in time prior to trial. Therefore, the court is declining to include in the litigation expenses to be considered in the sanctioning process attorneys' fees incurred by Trinity–Western through Broiles and his firm from April 29, 1991, the final trial date, through May 9, 1991, the date on which the take-nothing judgment was entered in favor of Trinity–Western. The court realizes that this is somewhat in the nature of an arbitrary penalty against Trinity–Western—the record does not affirmatively show that any court resources would have been saved if Trinity–Western had filed a dispositive motion. A reduction of this kind is justified by the message it will convey that, no matter what the court's work situation might be, the offended party normally should seek relief through the timely filing of a dispositive motion in a case such as this so that the presiding judge will at least have an opportunity to bring the case to an end prior to trial and thereby save judicial resources to be utilized for the benefit or more deserving litigants; and, this is so even though the non-filing of such a motion makes more economic sense to the offended party.

---

27. The court has verified through the records of the Clerk's office that Judge Belew was involved in the trials on the merits of No. CA4–85–116–K, styled "Charles Ernest Seastrunk, et al. v. Bell Helicopter Textron, Inc." from August 26, 1987, through September 17, 1987, of No. CA4–87–060–K, "Kathleen E. Connors, et al. v. United States of America", from March 1, 1988, through April 26, 1989, and of No. CR4–87–082, styled "United States of America v. Jacky Ronald Pace, et al.", from September 25, 1989, through September 11, 1990.

## IX.

### *The Sanctions to be Imposed*

When considering sanctions to be imposed on a prolific, wealthy, and powerful litigant such as FDIC and an experienced lawyer such as Guy, the primary goal should be to discourage the litigant and similarly situated potential litigants from pursuing baseless litigation. FDIC and Guy do not need to be taught the meaning of Rule 11. They already know that from prior encounters, such as the ones mentioned in footnote 25 in this memorandum opinion and order. *Thomas,* 836 F.2d at 877.

FDIC is not the typical litigant. In this action it, through knowledgeable lawyer personnel, made the important litigation decisions. Kenneth J. Marino, who was an attorney in FDIC's Dallas regional office in the latter part of 1985, made the decision to hire Jenkens & Gilchrist as counsel for FDIC in the institution and prosecution of this action. His affidavit suggests that his decision was not based on appropriate legal inquiry, even as to the claims that were asserted against Mutual.[28] FDIC's regional attorney, "based on the information furnished to him by Jenkens & Gilchrist, approved the concept of pursuing the claim against Trinity–Western if Jenkens & Gilchrist thought such a claim was warranted." Response of Federal Deposit Insurance Corporation and its Counsel to Order of October 5, 1992 at 1–2. The regional counsel had prior knowledge of the nature of the claims that were going to be asserted by FDIC against Trinity–Western before they were asserted. *Id.* at 2. Another in-house attorney for FDIC approved the filing of the 2nd Amended Complaint. *Id.* Other attorneys on the staff of FDIC were involved in the supervision and oversight of the litigation. *Id.* at 2–3. FDIC, through its personnel, was directly involved in the settlement decisions, and made the ultimate decision to reject Trinity–Western's offer. *Id.* at 5;

Fourth Affidavit of T. Ray Guy in Response to Motion for Sanctions at 5.

FDIC's litigation experience might well exceed that of any other litigant that has ever existed. Its outside litigation expenses for the years while this litigation was pending have totaled $1,639,700,000 ($54,400,000 for the year 1985, $44,800,000 for the year 1986, $53,400,000 for the year 1987, $57,900,000 for the year 1988, $100,200,000 for the year 1989, $627,900,000 for the year 1990 and $701,100,-000 for the year 1991). Response of Federal Deposit Insurance Corporation and its Counsel to Order of October 5, 1992, at 9, Ex. "D". FDIC's legal fee and expense payments to Jenkens & Gilchrist alone totaled $6,569,-227.28 during the years 1987, 1988, 1989, 1990, and 1991 (through July 16, 1991). Affidavit of T. Ray Guy with Respect to Jenkens & Gilchrist's Representation of FDIC, filed July 16, 1991; 7/23/91 Affidavit at 53. FDIC has been a litigant in more than 184,000 cases since 1985, the year this action was instituted. Response of Federal Deposit Insurance Corporation and its Counsel to Order of October 5, 1992, at 8–9.

The fees and expenses paid by FDIC to Jenkens & Gilchrist in reference to this litigation and related matters were in the total amount of more than one-half million dollars for just the years 1987, 1988, 1989, 1990, and the first half of 1991. Affidavit of T. Ray Guy with Respect to Jenkens & Gilchrist's Representation of FDIC; 7/23/91 Affidavit at 49.

A more prolific, powerful, and wealthy litigant would be difficult to imagine. Needless to say, the potential FDIC has to provide profitable legal business to outside counsel, such as its counsel in this action, gives it significant power to influence the decisions of its counsel, particularly in this day and age of legal business "hard to come by" for many law firms, large and small.

---

**28.** Marino seeks to justify FDIC's litigation conduct by pointing to the facts that other targets of FDIC's litigation tactics in this case, including Mutual and Calhoun, did not question the right of FDIC to assert certain of the claims it has asserted. Contentions of this kind appear throughout the papers FDIC and its counsel have filed in opposition to Trinity–Western's requests

for sanctions and attorneys' fees. The court is not persuaded that attorneys are relieved of their Rule 11 legal inquiry obligations by the circumstance that parties who logically would have questioned FDIC's litigation stances failed to do so. Moreover, these contentions overlook the fact that Mutual did file a Rule 11 motion at an early stage of this litigation.

Rule 11 expressly authorizes the court to impose sanctions on the "represented party." [29] In this action, the court has concluded that the signing attorneys and the represented party, FDIC, should all bear sanctions, but that the burden of the Rule 11 financial sanctions should fall on FDIC in the expectation that its attention will be gained and it will realize that it must pay a penalty if it allows its attorneys to institute and prosecute meritless litigation such as this. Significant financial sanctions against FDIC presumably will have a much broader based effect than financial sanctions imposed on individual attorneys handling its business. Not only will a message be sent to FDIC, but all potential litigants will be alerted to the risk of filing baseless litigation.

Trinity–Western has sought sanctions under Rule 11 in the form of recovery by it from Guy, Ries and FDIC of amounts representing litigation expenses and business loss suffered by Trinity–Western by reason of the litigation; and, Trinity–Western has suggested that Guy and Ries should be required to refund to the FDIC the sums they received for fees in this case. Motion for Sanctions under Fed.R.Civ.P. 11, with Legal Brief, filed May 15, 1991, at 12–16. The affidavits filed by Trinity–Western on May 15, 1991, establish that the pendency of this action against Trinity–Western has caused it to lose business, to its financial detriment. Trinity–Western suffered added loss because of the time Beadles, who also is an attorney, was required to devote to this litigation. He states in his affidavit that "he has devoted approximately 200 hours of his personal time in preparing for the defense of this action", which was "taken away from the business of Trinity–Western." Affidavit of Dudley Beadles, filed May 15, 1991, at 4.

■ In addition to its business losses, Trinity–Western has suffered financial detriment in the form of the attorneys' fees and litigation expenses it has incurred in this

action. Through January 10, 1992, Trinity–Western had incurred attorneys' fees of $95,015,25 and nontaxable legal expenses of $4,946.45, for a total of $99,961.70. See Request for Attorneys' Fees under 28 U.S.C. § 2412, with Legal Brief, filed January 10, 1992, at 7. The court finds that those litigation expenses were reasonable in amount when they were incurred and that they were reasonably and necessarily incurred in the defense of Trinity–Western in this action and in the preparation and presentation of material to the court on the issues of sanctions. Detailed itemizations of the work done, and the expenses incurred, by Broiles and his firm on behalf of Trinity–Western are a part of an affidavit of Broiles that accompanies the motion for sanctions Trinity–Western filed May 15, 1991, and are supplemented by subsequently filed affidavits of Broiles.

Trinity–Western has not shown that it is entitled to recover for its business losses under Rule 11. Therefore, the court is denying Trinity–Western's request for sanctions to that extent. Moreover, as the court indicated at an earlier point in this memorandum opinion and order, the court is denying Trinity–Western recovery as a sanction of attorneys' fees incurred by it through Broiles and his firm from April 29, 1990, through May 9, 1991. The items that are excluded are those shown with April 29, and 30, 1991, dates on statement No. 23, items shown with May 1, 2, 3, 4, and 6, 1991, dates on statement No. 25, and items shown with May 2, 6 and 9, 1991, dates on statement No. 27. According to the court's calculations, the total of the charges for attorneys' fees represented by the eliminated items is $12,001.25, leaving a balance of $87,960.45 when deducted from the $99,961.70 total through January 10, 1992.

■ The court has concluded that as a Rule 11 sanction for the certification violations of its counsel in this action, FDIC should pay to Trinity–Western $87,960.45.[30]

---

**29.** FDIC is not immune from Rule 11 sanctions. See In re Good Hope Indus., Inc., 886 F.2d 480 (1st Cir.1989).

**30.** The attorneys' fees and other litigation expense information that Trinity–Western has provided to the court does not include fees and other litigation expenses that were incurred by Trinity–

Western after January 1992 in response to the orders signed by the court in September and October 1992 directing the parties to provide further information on sanctions issues and to appear at a hearing, which ultimately was held October 29, 1992, on sanctions issues. If Trinity–Western files by the deadline fixed by this

The court finds that expenses in that amount (1) were caused by violations of Rule 11 by FDIC and its counsel and (2) are reasonable, considering the extent to which Trinity–Western's litigation expenses could have been avoided or were self-imposed. No lesser sanction imposed on FDIC would serve the deterrence goal of Rule 11, bearing in mind all of the things that have been discussed in preceding parts of this memorandum opinion and order. A fine imposed against FDIC would not serve a significant deterrence goal because, for all practical purposes, it would simply be a matter of FDIC shifting money from one pocket to another. Admonishments or reprimands would have little, if any, effect on a party such as FDIC. The court has considered the alternatives for sanctions against FDIC, and finds that none of them would serve the goal the court has concluded must be served in this case, the deterrence of a powerful party from bringing baseless litigation.

A byproduct of the sanction the court is imposing on FDIC will be the service of the punishment and compensation goals of Rule 11. There is no lesser sanction that would serve those goals to an appropriate degree in this action. FDIC and similarly situated litigants must be taught that they cannot profit from the filing of frivolous lawsuits such as this and that there is a penalty to pay when they try to gain such a profit. The only effective way for that lesson to be conveyed is for the court to impose significant financial penalties upon the litigant; and, the most appropriate measure of the financial penalty to be imposed is the amount of the litigation expense the frivolous litigation has caused its victim to incur. Though such a sanction does not make the victim whole, it goes far toward rectifying the wrong.

Another beneficial byproduct of the sanction is service of the goal of education. Presumably those on the staff of FDIC will be called to answer by higher authority for the funding and approval by FDIC of litigation of this sort; and, the court expects that the long-term response will be that the decision-makers within FDIC who authorized this

litigation and who in the future will have the power to authorize litigation will be more cautious. The court regrets that public funds will be called upon for satisfaction of the sanction award, but finds consolation in the fact that probably sanction awards such as this will, in the long run, save tremendous amounts of public funds from being dissipated in the pursuit of frivolous litigation and will provide a litigation environment that will free judicial resources for the handling of deserving matters. Powerful litigants, such as FDIC, can use baseless litigation such as this as something of an extortionary club to force unwarranted settlement payments from financially vulnerable litigants who are faced with the threat of financial ruin from payment of litigation expenses if they do not meet the powerful litigant's settlement demands. Conduct of that kind over a period of time has the tendency to educate financially vulnerable litigants, or potential litigants, of the futility of resisting. If FDIC and similarly situated litigants, and the potential victims of their baseless litigation, learn that the powerful litigant cannot profit, but can be penalized, for the bringing of litigation of this kind, a more wholesome litigation environment will exist.

 The court turns now to a consideration of the nature of sanctions to be imposed on the signing attorneys, Guy and Ries. The court has decided not to impose financial sanctions against either of them under Rule 11. The impact of the Rule 11 financial sanction that is being imposed on FDIC is sufficient to serve the rule's goal of compensation of the offended party. The award made in favor of Trinity–Western against counsel for FDIC pursuant to the authority of 28 U.S.C. § 1927 is sufficient to alert the attorneys to the financial risk of instituting and prosecuting baseless litigation. Bearing in mind the other rulings the court is making in this memorandum opinion and order, the court has concluded that appropriate Rule 11 sanctions to be imposed on Guy and Ries are the following:

memorandum opinion and order substantiation of additional litigation expenses, the court will consider making a modification order as to the

amount of the financial sanctions the court is ordering to be paid.

(a) Each of them shall attend fifteen (15) hours of a course or courses, to be approved in advance by the court, providing instruction and information on the ethical responsibilities of an attorney; and

(b) Each of them shall provide a letter to Trinity–Western by which the attorney extends his or her apologies to Trinity–Western for the institution and prosecution of this action against Trinity–Western and expresses regret that Trinity–Western has suffered whatever losses it has experienced as a result of this litigation.

While these sanctions against the signing attorneys would normally be inadequate as Rule 11 sanctions under the circumstances of this case, when they are considered in context with the financial sanctions that are being imposed against FDIC, and the court's rulings based on 28 U.S.C. § 1927, they will be adequate to meet the goals to be served.

The court concludes that the Rule 11 sanctions the court is imposing are the least severe sanctions adequate to serve the purposes of Rule 11.

### X.

*Reasons Why Litigation Expenses Should be Awarded Under 28 U.S.C. § 1927*

█ In pertinent part, § 1927 reads as follows:

Any attorney ... admitted to conduct cases in any court of the United States ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

Section 1927 "permits a court to assess against an attorney who so multiplies the proceedings in any case unreasonably and vexatiously the excess costs, expenses, and attorney's fees incurred as a result of such conduct." *Thomas,* 836 F.2d at 870 n. 3. It "imposes a continuing obligation on attorneys by prohibiting the persistent prosecution of a meritless claim." *Id.* at 875. Awards under § 1927 are penal in nature. *Browning v. Kramer,* 931 F.2d 340, 344 (5th Cir.1991). "Strict construction of this statute is neces-

sary so that the legitimate zeal of an attorney in representing [his or her] client is not dampened." *Id.* The liability created by § 1927 is "only for *excess* costs, expenses and attorneys' fees reasonably incurred because of the attorney's unreasonable and vexatious multiplication of the proceedings." *Id.* "[O]nly those fees and costs associated with 'the persistent prosecution of a meritless claim' may be awarded." *Id.* at 345. "[W]hen the entire course of proceedings were unwarranted and should neither have been commenced nor persisted in", the entire financial burden of an action's defense can be shifted under § 1927. *Id.*

█ For reasons previously noted, the claims asserted by FDIC against Trinity–Western should never have been asserted. The mere assertion of those claims in this action was unreasonable and vexatious. For the same reasons, prosecution of the action against Trinity–Western was unreasonable and vexatious from beginning to end. Consequently the mere conduct of instituting this action against Trinity–Western and of thereafter prosecuting it constituted a multiplication of the proceedings against Trinity–Western unreasonably and vexatiously. All litigation expenses, including attorneys' fees, incurred by Trinity–Western in the defense of this action were incurred as a result of conduct of counsel for FDIC in multiplying the proceedings in this case unreasonably and vexatiously.

In Trinity–Western's reply brief and supplement regarding motion for sanctions, filed July 23, 1991, Trinity–Western proposed 28 U.S.C. § 1927 as a basis for imposition of sanctions on Jenkens & Gilchrist as well as Guy and Ries. The court disagrees with Trinity–Western's proposal that the firm of Jenkens & Gilchrist be the subject of sanctions under § 1927. Individual lawyers, not law firms, are admitted to conduct cases in this court. However, the court has concluded that John A. Gilliam (hereinafter "Gilliam"), who has shared with Guy the responsibility, as attorneys of record for FDIC, for the handling of the case, should be the subject of sanctions under § 1927. The papers in this action indicate that he is the senior attorney within his firm who was involved in

the initiation and prosecution of the litigation. He was "involved in and agreed with the decision to add Trinity–Western as a defendant." Affidavit of John A. Gilliam in Response to Trinity–Western's Motion for Sanctions at 2. Throughout, Gilliam's name has appeared below the signature line for counsel of record for FDIC. The court finds that Gilliam and Guy had the principal responsibility for institution of the action against Trinity–Western and for its prosecution throughout the action's pendency and that their conduct in those respects constituted a multiplication of all proceedings in this action unreasonably and vexatiously. Ries collaborated with, and assisted, Gilliam and Guy in the unreasonable and vexatious prosecution of the meritless claim against Trinity–Western commencing at a point in time no later than the filing of the 2nd Amended Complaint and going through the date on which this action was concluded on its merits. The court has concluded that Gilliam and Guy should be held accountable under § 1927 to pay litigation expenses of Trinity–Western, but the court has decided that, because of Ries's relative inexperience and the probability that she was acting under the influence and direction of Gilliam and Guy, she should not be required to pay litigation expenses under § 1927.

■ Trinity–Western has presented a plausible case that all its litigation expenses constitute "excess costs, expenses and attorneys' fees reasonably incurred because of" conduct of a kind contemplated by § 1927. However, for the same reasons why litigation expenses incurred by Trinity–Western from April 29, 1991, through May 9, 1991, were not included in the amount of the Rule 11 sanction imposed against FDIC, the court is not including those expenses in the award in favor of Trinity–Western against Gilliam and Guy under § 1927. Moreover, the court is not including in the award against and Gilliam and Guy any of the expenses related to the post-trial sanction motions because the court has concluded that all but a relatively insignificant part of the attorney time devoted to Trinity–Western's sanction motions was to the end of gaining sanctions under Rule 11, with the consequence that those expenses more appropriately should be treated as a part of the Rule 11 sanction rather than as a part of any other sanction request made by Trinity–Western. The total of the attorneys' fees and litigation expenses itemized with the affidavit of Broiles that accompanied Trinity–Western's motion for sanctions under Rule 11, filed May 15, 1991, is $75,857.95. When the attorney fee items for April 29, 1991, and after are deleted, the balance is $63,856.70, which is the amount the court finds constitutes the excess costs, expenses, and attorneys' fees reasonably incurred by Trinity–Western by reason of the conduct of Gilliam and Guy of the kind contemplated by § 1927.

■ Therefore, the court is ordering that Gilliam and Guy are jointly and severally obligated to pay to Trinity–Western $63,856.70. Their payment obligation is joint and several with FDIC's Rule 11 payment obligation to the extent of $63,856.70.

■ The financial resources of a sanctioned party can be taken into account in determining the sanction to be imposed. *See Coats v. Pierre*, 890 F.2d 728, 734 (5th Cir. 1989), *cert. denied*, 498 U.S. 821, 111 S.Ct. 70, 112 L.Ed.2d 44 (1990). Gilliam and Guy each has filed, under seal, information concerning his personal financial situation, which reflects that each of them has sufficient financial resources to enable him to make payment of this § 1927 sanction without suffering a financial hardship.

## XI.

### *Trinity–Western's Request for Recovery of Litigation Expenses Pursuant to 28 U.S.C. § 2412*

■ Trinity–Western's contentions relative to recovery of attorneys' fees from FDIC under 28 U.S.C. § 2412 are described at page 21 of this memorandum opinion and order. Its contention that § 2412(d)(1)(A) applies is without merit. FDIC's case against Trinity–Western sounds in tort; and, the fact that FDIC asserts the claim as an assignee does not change the character of the claim. However, Trinity–Western's contention in reference to recoverability of attorneys' fees from FDIC under § 2412(b) has merit. Section

2412(b) provides, in pertinent part, as follows:

(b) Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys, in addition to the costs which may be awarded ... to the prevailing party in any civil action brought by ... any agency ... of the United States ... in any court having jurisdiction of such action. The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law....

28 U.S.C. § 2412(b).

There is no statute that prohibits an award of litigation expenses against FDIC. If the basis of the award under § 2412(b) is "a finding that the United States acted in bad faith, then the award shall be paid by any agency found to have acted in bad faith...." 28 U.S.C. § 2412(c)(2). Therefore, FDIC is liable to the same extent that any other party would be liable under the common law. The rule is now well-established that, under the common law, a district court has the inherent power to "award to the prevailing party reasonable attorney's fees upon a showing that an attorney has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Thomas*, 836 F.2d at 870–71 n. 3. In *Thomas*, the court went on to explain that:

Finally, pursuant to its inherent power, a district court may award reasonable attorney's fees to the prevailing party when the losing party has acted in bad faith in actions that led to the lawsuit or in the conduct of the litigation. *See Hall v. Cole*, 412 U.S. 1, 15, 93 S.Ct. 1943, 1951, 36 L.Ed.2d 702 (1973); *Batson [v. Neal Spelce Assocs., Inc.*, 805 F.2d 546, 550 (5th Cir.1986) ].

*Id.* at 875.

FDIC, as well as its counsel, acted in bad faith in the actions that led to this lawsuit against Trinity–Western and in the conduct of the litigation.

The fact that sanctions are imposable under Rule 11 and § 1927 does not preclude imposition of sanctions by reason of bad faith conduct of a party or its counsel. *See Chambers v. NASCO, Inc.*, — U.S. —, — – —, 111 S.Ct. 2123, 2133–36, 115 L.Ed.2d 27, 46–48 (1991). However, "when there is bad faith conduct in the course of litigation that could be adequately sanctioned under the rules, the court ordinarily should rely on the rules rather than the inherent power." — U.S. at —, 111 S.Ct. at 2126, 115 L.Ed.2d at 48. Because the conduct of FDIC can be, and has been, adequately sanctioned under Rule 11, the court is not resorting to its inherent power.

## XII.

## ORDER

The court, therefore, ORDERS that:

(a) FDIC pay to Trinity–Western EIGHTY–SEVEN THOUSAND NINE HUNDRED SIXTY AND 45/100 DOLLARS ($87,960.45) as a sanction under Fed.R.Civ.P. 11, which payment shall be made by FDIC to Trinity–Western by March 25, 1993;

(b) Gilliam and Guy, jointly and severally with each other and with FDIC, shall pay to Trinity–Western SIXTY–THREE THOUSAND EIGHT HUNDRED FIFTY–SIX AND 70/100 DOLLARS ($63,856.70), which payment shall be made by March 25, 1993, as an award under 28 U.S.C. § 1927;

(c) All payments made by FDIC pursuant to its payment obligation in (a) above shall serve as a credit on the payment obligations imposed on Gilliam and Guy by (b) above, and all payments made by Gilliam or Guy on the payment obligations imposed on them by (b) above shall be a credit on the payment obligation imposed on FDIC by (a) above;

(d) By March 25, 1993, Guy and Ries each shall provide a letter to Trinity–Western by which the attorney extends his or her apologies to Trinity–Western for the institution and prosecution of this action against Trinity–Western and expresses regret that Trinity–Western has suffered whatever losses it has experienced as a result of the litigation;

(e) By June 1, 1993, Guy and Ries each shall attend fifteen (15) hours of a course or courses, to be approved in advance by the court, providing instruction and information on the ethical responsibilities of an attorney; and

(f) If Trinity–Western wishes to increase the payment obligation created by (a) above based on litigation expenses it has incurred after January 1992 in response to the orders signed by the court in September and October 1992, it shall file by February 10, 1993, an itemization, verified by the oath of its counsel, of such litigation expenses.

The court further ORDERS that, except as to the personal financial information concerning Gilliam, Guy and Ries that was submitted to the court in response to the order signed by the court October 4, 1992, all items that have been received under seal, or placed under seal, in this action are hereby unsealed, and that such personal financial information pertaining to Gilliam, Guy and Ries remain under seal.

The court further ORDERS that the motion of FDIC to strike the second affidavit of Broiles, and the appendix thereto, be, and is hereby, denied.

## APPENDIX A

FDIC, Trinity Western and Day stipulate to the following facts:

a. Plaintiff FDIC is a federal banking agency, organized and existing under the laws of the United States.

b. Defendant Calhoun is an individual resident of Parker County, Texas and was formerly the President of Northwest Bank.

c. Defendant Northwest Financial is a Texas corporation.

d. Defendant Day is an individual resident of Brown County, Texas.

e. Defendant Trinity–Western is a Texas corporation.

f. This Court has jurisdiction over the subject matter of this Cause under 12 U.S.C. § 1819.

g. Venue is proper in this District and Division.

h. Northwest Bank was formerly a banking organization chartered under the laws of the State of Texas, having its principal offices and place of business in White Settlement, Texas. On May 23, 1985, the Board of Directors of Northwest Bank closed Northwest Bank and placed it in the hands of the State Banking Commissioner for liquidation. The State Banking Commissioner then tendered the appointment as Receiver of Northwest Bank to the Federal Deposit Insurance Corporation ("FDIC"), which accepted the appointment and became the Receiver of Northwest Bank. The FDIC as Receiver then entered into a purchase and assumption transaction with Landmark Bank ("Landmark") in which the FDIC as Receiver (1) conveyed certain assets formerly owned by Northwest Bank to Landmark, which also assumed certain liabilities of Northwest Bank, and conveyed the remaining assets formerly owned by Northwest Bank to the Federal Deposit Insurance Corporation, in its Corporate Capacity ("FDIC Corporate"). Among the assets of Northwest Bank conveyed by FDIC Receiver to FDIC Corporate were the claims and causes of action of the Bank, if any.

i. At all times relevant herein, Northwest Bank was a wholly-owned subsidiary of Northwest Financial Corporation ("Northwest Financial"), and Defendant Calhoun was the owner of all of the common stock of Northwest Financial. Larry Calhoun was also the President of Northwest Bank and the Vice President of Northwest Financial.

j. Northwest Bank formerly occupied space in a four-story building located at 101 Jim Wright Freeway, White Settlement, Texas (the "Bank Building"). Prior to July 26, 1984, the Bank Building was owned by NWB Corporation ("NWB"), which was a wholly-owned subsidiary of Northwest Bank. Northwest Bank leased space in the Bank Building under a Lease Agreement (the "1979 Lease") between NWB as Lessor and Northwest Bank as Lessee.

k. Also on July 26, 1984, NWB conveyed the Bank Building to Northwest Financial by Warranty Deed. At the time of such conveyance, and at all times thereafter until Northwest Bank was declared insolvent and the FDIC was appointed Receiver thereof, Defendant Northwest Financial was the owner of all shares of stock of Northwest, Defendant Calhoun was the owner of all shares of stock of Defendant Northwest Financial, and Northwest Bank was the owner of all the shares of stock of NWB Corporation.

l. Also on July 26, 1984, Northwest Financial conveyed the Bank Building to Larry Calhoun.

m. Also on July 26, 1984, Calhoun borrowed $4,000,000 from Mutual Building & Loan Association, Weatherford, Texas ("Mutual"), with the Bank Building securing Calhoun's indebtedness to Mutual.

n. Trinity Western Title Company ("Trinity Western") issued a mortgagee title insurance policy in favor of Mutual in connection with the July 26, 1984 loan from Mutual to Larry Calhoun secured by the Bank Building. Gayle Dickehut was licensed escrow officer for Trinity Western.

o. Trinity Western issued checks out of its Escrow Account to disburse proceeds of the closing. Among the checks issued by Trinity Western were two checks each payable to Larry Calhoun, each in the amount of $740,995.12.

p. Defendant Trinity–Western is engaged in the business of closing real estate transactions and issuing title insurance policies. Defendant Trinity–Western, · on or about June 29, 1984, issued a commitment for mortgagee title insurance (on behalf of a title insurance underwriter) in favor of Mutual with respect to a proposed loan from Mutual to Defendant Calhoun.

IN THE UNITED STATES
DISTRICT COURT

FOR THE NORTHERN DISTRICT
OF TEXAS

FORT WORTH DIVISION

Federal Deposit Insurance Corporation, in its Corporate Capacity as Liquidator of Northwest Bank, Plaintiff

vs.

Larry H. Calhoun, Northwest Financial Corporation, George Day, Gayle Dickehut, and Trinity–Western Title Company, Defendants.

Civil Action Number CA4–85–677–A

Filed May 3, 1991

STIPULATION AS TO FACTS
TO THE HONORABLE COURT:

The parties submit this Stipulation. The parties stipulate that the following facts are true:

STIPULATION OF FACTS
1. THE PARTIES

1.1. *Northwest Bank.* Northwest Bank was a state chartered bank in 1984. On May 23, 1985, it was declared insolvent by its directors who tendered it to the State Banking Commissioner, who turned it over to the FDIC–Receiver, which then transferred certain of the bank's assets, claims, and causes of action to FDIC–Corporate pursuant to Exhibit 81.

1.2. *Northwest Financial Corporation* ("Northwest Financial"). Northwest Financial was a Texas corporation and a Bank Holding Company, under the supervision of the Federal Reserve Board. In July 1984 and thereafter Northwest Financial owned 100 percent of the shares of Northwest Bank. Its President in 1984 was Elsie Calhoun, the wife of Larry Calhoun.

1.3. *NWB Corporation* ("NWB Corp."). NWB Corp. was a Texas corporation in 1984, its President was Larry Calhoun, and 100 percent of its shares were owned by Northwest Bank. It owned the property (identified in 1.9), into which it had invested approximately $1 million (Exhibit 64).

1.4. *Larry Calhoun.* In July 1984 Mr. Calhoun owned 100 percent of the shares of Northwest Financial. He was the President and Chairman of the Board of Directors of the Northwest Bank and of its subsidiary NWB Corp.

1.5. *George Day.* Mr. Day and Mr. Calhoun had had business dealings and Mr. Day had an attorney's office in the bank building. He was an authorized fee attorney for Trinity–Western and employed Ms. Gayle Dickehut. Ms. Dickehut was an approved escrow officer of Trinity–Western. Mr. Day was not an officer, or director, or shareholder of Northwest Financial, Northwest Bank, or NWB Corp.

1.6. *Mutual Building & Loan Association* ("Mutual"). Mutual was located in

Weatherford, Texas, and committed to make a $4 million loan to Mr. Calhoun pursuant to Exhibit 29, which loan was to be secured by the property and an assignment of lease (Exhibits 21 and 41). The loan was funded on July 27, 1984, and subsequently Mutual foreclosed on the property. Mutual was sued by FDIC in September 1985, pursuant to Exhibit 93, but was dismissed on October 12, 1988, after settling with FDIC, pursuant to Exhibits 96 and 97.

1.7. *Trinity–Western Title Company* ("Trinity–Western"). Trinity–Western is a Texas corporation which issues title insurance for various insurers and closes real estate transactions. Gayle Dickehut was an escrow officer for Trinity–Western in July 1984. Trinity–Western, through Ms. Dickehut, handled part of the closing of the July 26–27, 1984 transaction.

1.8. *FDIC–Corporate* ("FDIC"). The Plaintiff is the FDIC–Corporate, which in a Purchase and Assumption transaction acquired any claims or causes of action of the Northwest Bank pursuant to Exhibit 81.

1.9. *The Property* ("the Property"): The bank building and real estate owned by NWB Corp. was located in Tarrant County, Texas, with the Northwest Bank as one tenant. The property was transferred by NWB Corp. to Northwest Financial by a Warranty Deed (Exhibit 38). The property was transferred to Mr. Calhoun on July 26, 1984, pursuant to a Warranty Deed (Exhibit 39) or a Warranty Deed with Vendor's Lien (Exhibit 40).

## 2. THE TRANSACTION

2.1. On July 26–27, 1984, the relationship of the participants in the transaction was:

2.2. On June 20, 1984, NWB Corp.'s directors adopted a resolution authorizing NWB Corp. to sell the property to Mr. Calhoun for $2.5 million, pursuant to the minutes of NWB Corp. as reflected in Exhibit 8 and it authorized the Resolution (Exhibit 9).

2.3. On June 20, 1984, the directors of Northwest Bank approved the resolution of

NWB Corp. to sell the property to Mr. Calhoun with Mr. Calhoun not voting, pursuant to the minutes of Northwest Bank, Exhibit 7, and adopted a resolution authorizing execution of documents (Exhibit 10). At that time Northwest Bank owned 100 percent of the shares of NWB Corp.

2.3. On June 21, 1984, the Minutes of the Board of Directors of Northwest Financial reflect that Mr. Calhoun submitted a proposal to Northwest Financial Corporation whereby he would purchase the Northwest Bank building for the sum of $2.5 million, as reflected in Exhibit 11, and the Directors approved a resolution authorizing the execution of documents in connection with the sale, which is also in Exhibit 12.

2.5. By a document dated June 27, 1984, Larry Calhoun submitted a written application to Mutual for a loan to him with the property as security (Exhibit 17). He submitted financial statements (Exhibit 13), the application (Exhibit 17), and an appraisal (Exhibit 6).

2.6. On July 20, 1984, Mutual's Loan Committee approved the Mortgage Loan Commitment (Exhibit 15) to Mr. Calhoun, which had been signed by Mr. Calhoun on July 19, 1984 (Exhibit 29). The written commitment was executed by Mutual and Mr. Calhoun.

2.7. On July 26, 1984, NWB Corp. executed a warranty deed conveying the property to Northwest Financial (Exhibit 38), pursuant to a corporate authorization attached to the deed (Exhibits 9 and 38), which was properly recorded.

2.8. On July 26, 1984, Northwest Financial executed a warranty deed (Exhibit 39) to Mr. Calhoun conveying the property pursuant to a corporate authorization. Also, Northwest Financial executed a Warranty Deed with Vendor's Lien (Exhibit 40) conveying the property to Mr. Calhoun.

2.9. On July 26, 1984, Ms. Dickehut prepared a Settlement Statement which showed a $4 million purchase price from Mr. Calhoun to Northwest Financial, as reflected on Exhibit 33, and showed $2,946,491.91 cash due to seller Northwest Financial. This statement was prepared by Ms. Dickehut in Fort Worth, Texas. It was signed by Mrs. Calhoun as President of Northwest Financial or the seller and Mr. Calhoun as the buyer. There were no disbursements at this time, as the loan had not been funded.

2.10. Thereafter, but on July 26, 1984, Mr. and Mrs. Calhoun went to Mutual, to Mr. Bankhead's law office. At Mr. Bankhead's office at Mutual in Weatherford, Mr. Calhoun executed the $4 million Note (Exhibit 46) and a Deed of Trust to Mutual (Exhibit 47) and numerous loan documents and disclosures. The Deed of Trust was properly recorded.

2.11. On July 27, 1984, Mutual delivered a $4 million check to Ms. Dickehut in Fort Worth. Mr. Calhoun told Ms. Dickehut that the Settlement Statement (Exhibit 33) she had prepared the day before was incorrect. Ms. Dickehut changed the July 26 Settlement Statement (Exhibit 33) she had previously prepared by whiting out some numbers and typing over them. The Settlement Statement as changed is reflected in Exhibit 34. Ms. Dickehut gave this Statement to Mr. Calhoun or the Bank's runner. Ms. Dickehut did not send it to Mutual. Funds were disbursed pursuant to the Settlement Statement as changed on July 27, 1984.

2.12. Ms. Dickehut wrote two checks (among others) on a Trinity–Western escrow account at Northwest Bank to Mr. Calhoun (Exhibit 51) in the amounts of $740,955.12. Check # 265 was endorsed "pay to the order of G.A. Day" and deposited into his account at Northwest Bank on or about July 31, 1984. Mr. Calhoun and Mr. Day contend this was a payment on a debt Mr. Calhoun owed to Mr. Day. The second check # 264 (Exhibit 51) was deposited to Mr. Calhoun's account at Northwest Bank on or about July 27, 1984. A check was written to Northwest Financial for $1,485,242.40 and $996,418.19 was wired to pay off the mortgage owed by NWB Corp.

2.13. The Minutes of the Directors of Northwest Bank dated August 7, 1984 (Exhibit 59), reflect Mr. Calhoun reported the terms of the transaction to the directors of Northwest Bank. A copy of the Lease (Exhibit 21) between Mr. Calhoun and Northwest Bank was attached to the Directors' Minutes (Exhibit 59).

### 3. POST–TRANSACTION EVENTS

3.1. On May 23, 1985, the Directors of the Northwest Bank placed it in the hands of James L. Sexton, the State Banking Commissioner, who tendered it to FDIC–Receiver, pursuant to Exhibit A, attached to Exhibit 93.

3.2. FDIC–Receiver assigned certain assets to FDIC–Corporate, as reflected in Exhibit 81.

3.3. Mutual posted the property for foreclosure on September 9, 1985, pursuant to Exhibit 88.

3.4. On September 30, 1985, FDIC sued Mutual, Northwest Financial, and Mr. Calhoun to enjoin the foreclosure and recover the property, pursuant to Exhibit 93. On October 11, 1985, FDIC filed a lis pendens against the property, as reflected by Exhibit 90. FDIC, by agreement with Mutual, allowed the foreclosure to proceed in November 1985.

3.5. On July 24, 1987, FDIC filed its First Amended Original Complaint (Exhibit 95), suing Mr. Day, Ms. Dickehut, and Trinity-Western.

3.6. On October 12, 1988, FDIC settled with Mutual and the title insurer, Southern Guaranty Title Insurance Company, for payment of $150,000 (Exhibit 96). Mutual was dismissed from the lawsuit on October 12, 1988, pursuant to Exhibit 97. The lis pendens was released pursuant to the settlement.

### 4. ADDITIONAL STIPULATIONS

4.1. FDIC made no demand on NWB Corp. to bring a lawsuit against any person or entity relating to the transaction.

4.2. The Minutes of the Directors of NWB Corp. reflect that on January 3, 1985, the actions of the officers in 1984 were ratified, adopted, and confirmed (Exhibit 68).

4.3. The Minutes of the Stockholders of NWB Corp. of January 3, 1985, reflect that each and all of the past acts of the directors and officers of the corporation for the preceding year are hereby ratified, adopted, and confirmed (Exhibit 69).

4.4. The leases that were in effect on May 23, 1985, as to non-bank space in the bank building, are accurately summarized in Exhibit 106.

AGREED AND APPROVED TO THE ABOVE AND FOREGOING:

ATTORNEYS FOR PLAINTIFF, FDIC

By: /s/ T. Ray Guy

 T. Ray Guy

 State No. 08648500

JENKENS & GILCHRIST, P.C.

3200 First Interstate Tower

1445 Ross Avenue

Dallas, TX 75202–2711

Phone: (214) 855–4358

FAX: (214) 855–4300/4400

ATTORNEY FOR TRINITY–WESTERN TITLE COMPANY

By: /s/ R. David Broiles

 R. David Broiles

 State No. 03054500

BROWN, HERMAN, SCOTT, DEAN & MILES

203 Fort Worth Club Building

306 West Seventh Street

Fort Worth, TX 76102–4988

(817) 332–1391 Metro: 429–0851

FAX: (817) 870–2427

ATTORNEY FOR GEORGE DAY

By: /s/ John Collins

 John Collins

 State No. 04613000

3500 Oak Lawn, Suite 270

Dallas, TX 75219–4343

Phone: (214) 522–9552

FAX: (214) 526–1298

### ORDER

Came on for consideration the motion of defendant Trinity–Western Title Company for additional attorneys' fees. The court finds that the motion should be granted as set forth herein.

The court ORDERS that defendant's motion for additional attorneys' fees be, and is hereby, granted in part and that plaintiff, Federal Deposit Insurance Corporation, pay to defendant the sum of EIGHT THOU-

196

SAND FOUR HUNDRED FIFTY–THREE AND 37/100 DOLLARS ($8,453.37) as a sanction pursuant to Fed.R.Civ.P. 11, which payment shall be made by FDIC to defendant by March 25, 1993. The sum awarded pursuant to this order is in addition to the sanction imposed by the court's memorandum opinion and order of January 22, 1993, and is imposed for the same reasons set forth therein.

